# SUPREME COURT—IN BANCO.

## APRIL TERM—1864.

In the matter of the Estate of His Majesty Kamehameha IV.,
late deceased.

History of the nature of land tenures in this Kingdom, and construction of the Act of 7th June, 1848, as affecting the rights of dower and inheritance in the lands set apart to the Crown by the instrument of reservation, executed by Kamehameha III. on the 8th March, 1848.

By the said Act, which is entitled "An Act relating to the lands of his Majesty the King and of the Government," the lands reserved to the then reigning sovereign, descend in fee, the inheritance being limited to the successors to the throne, each successive possessor having the right to dispose of the same as private property, subject however to her Majesty's right of dower, there being nothing in the said Act, taking away the Queen's right to dower in the reserved lands, therein named : Nor, is there any law of the Kingdom, making the matrimonial rights of the wife of the King, any less or different from those of the wife of any private gentleman.

The descent of that part of his late Majesty's estate, other than the lands, reserved to the Crown by the Act of 1848, must be governed by the general law of inheritance and distribution, and her Majesty Queen Emma is entitled as statutory heir to one-half of that property, instead of dower, the latter right being merged in the superior right of heir, after payment of such debts as are not specifically charged upon the reserved lands.

Justice Robertson delivered the judgment of the Court as follows :

A difference of opinion having arisen touching the descent of the property held and possessed by his late Majesty Kamehameha IV., a case has been submitted to the Court, upon an agreed statement of facts, in order that the rights of the several high personages interested may be solemnly adjudicated upon and amicably settled.

It is claimed on behalf of his Majesty Kamehameha V., that he, as hereditary successor to the throne, shall inherit the entire estate, both real and personal, derived from his Majesty Kamehameha III., at his decease, and held by Kamehameha IV., the King lately deceased.

Estate of His Majesty Kamehameha IV.

On the part of Queen Emma, lately the consort of his Majesty Kamehameha IV., it is claimed that all the property possessed by her late royal husband was his private property, and must descend in accordance with the general law of the Kingdom, and that she is therefore entitled to inherit one-half of his real and personal estate, after payment of his debts, and to take dower in the other half.

We deem it unnecessary to recapitulate here the statement of facts submitted on behalf of the parties, as these facts will be referred to in the course of our decision, as such reference may be necessary to elucidate the grounds upon which our judgment rests.

In order to simplify the case we will first dispose of the claim for dower in one-half of the estate, in addition to an absolute right in the other half, as heir under the Statute, set up on behalf of Queen Emma. In our opinion, if she is entitled to dower at all, she must take dower in the entire estate which came to her late royal husband with the Crown, at the demise of his predecessor Kamehameha III. If, as is claimed on her behalf, she is entitled as a statutory heir to take one-half of her late husband's estate absolutely by way of inheritance, she cannot take dower also in the other half. In that case her right to dower, as widow, would be lost in her superior right to inherit as an heir. She cannot take in both those rights in the same estate.

The claim to the entire estate, as an appanage of the Crown, put forward by the Attorney-General on behalf of his Majesty the present King, is made to rest chiefly on the construction which it is contended should be given to the Statute passed on the 7th day of June, A. D. 1848, entitled "An Act relating to the lands of his Majesty the King, and of the Government." The preamble to that Act, and the portions of it which bear upon the case, read as follows :

"WHEREAS, It hath pleased his most gracious Majesty Kamehameha III., the King, after reserving certain lands to himself as his own private property, to surrender and forever make over unto his chiefs and people the greater portion of his royal domain ;

"*And whereas*, It hath pleased our Sovereign Lord the King,

to place the lands so made over to his chiefs and people in the keeping of the House of Nobles and Representatives, or such person or persons as they may from time to time appoint, to be disposed of in such manner as the House of Nobles and Representatives may direct, and as may best promote the prosperity of this Kingdom and the dignity of the Hawaiian Crown; therefore,

"Be it enacted by the House of Nobles and Representatives of the Hawaiian Islands in Legislative Council assembled,

"That, expressing our deepest thanks to his Majesty for this noble and truly royal gift, we do hereby solemnly confirm this great act of our good King, and declare the following named lands, viz : (Here follow the names of the several lands.) To be the private lands of his Majesty Kamehameha III., to have and to hold to himself, his heirs and successors forever ; and said lands shall be regulated and disposed of according to his royal will and pleasure, subject only to the rights of tenants."

After the foregoing follows the acceptance by the Legislature of the lands made over by the King to the Hawaiian Government, the lands being mentioned by name.

It is contended by the Attorney-General that by the true construction of this act it must be understood as declaring that the lands reserved to himself by Kamehameha III., in the grand division of 1848, were to descend forever to his heirs and successors on the throne, as a Royal Domain annexed to the Hawaiian Crown, and that they are not subject even to the right of dower.

On the other hand it is argued that by a fair construction of the act taken in connection with the instrument of reservation signed and sealed by Kamehameha III. on the 8th day of March, 1848, of which the act of the Legislative Council was simply a confirmation, the lands in question were declared to be the private property of Kamehameha III., his heirs and assigns, that as such, they are not only subject to the right of dower, but distributable under the statute regulating the descent of property generally like other private estates of persons dying intestate, and that therefore her Majesty Queen Emma, in the absence of any lineal heir of her husband, the late King, is entitled to one-half of the estate under the peculiar provisions of Hawai-

ian law, which would pass the other half to his Royal Highness M. Kekuanaoa, the surviving father of the late as of the present King.

The view which the Court takes of this matter, after the most careful examination and reflection, agrees in some respects with the views so ably propounded by the learned counsel for both the royal claimants, and yet as will be seen, differs materially from either.

It is conceded that the Court, in order to enable it to give a just construction to the act of the 7th of June, 1848, is at liberty to refer not only to the two instruments executed by his Majesty Kamehameha III., on the 8th of March, 1848, which were unquestionably the foundation of the Legislative enactment, but also to Hawaiian history, custom, legislation and polity, as well as to the records of the Privy Council, and the acts of the parties immediately interested subsequent to the great division.

The nature of land tenures in this Kingdom, prior to the great changes effected during the reign of Kamehameha III., will be found very clearly explained in the "Principles adopted by the Board of Commissioners to quiet Land Titles," (vol. 2 Statute Laws, page 81,) which were drawn up with much care upon the most valuable testimony that could be obtained. It is therein declared that "When the islands were conquered by Kamehameha I., he followed the example of his predecessors, and divided out the lands among his principal warrior chiefs, retaining, however, a portion in his own hands to be cultivated or managed by his own immediate servants or attendants. Each principal chief divided his lands anew and gave them out to an inferior order of chiefs or persons of rank, by whom they were subdivided again and again after (often) passing through the hands of four, five or six persons from the King down to the lowest class of tenants. All these persons were considered to have rights in the lands, or the productions of them, the proportions of which rights were not clearly defined, although universally acknowledged. All persons possessing landed property, whether superior landlords, tenants or sub-tenants, owed and paid to the King not only a land tax, which he assessed at pleasure, but also service which was called for at discretion, on all the grades from the highest down. They also owed and

Estate of His Majesty Kamehameha IV.

paid some portion of the productions of the land in addition to the yearly taxes. A failure to render any of these was always considered a just cause for which to forfeit the lands. The same rights which the King possessed over the superior land-lords and all under them, the several grades of landlords possessed over their inferiors, so that there was a joint ownership of the land, the King really owning the allodium, and the person in whose hands he placed the land, holding it in trust." Such was the nature of the tenures, and such the titles by which the lands were held, when in 1839 protection was declared both for person and property in the following words: "Protection is hereby secured to the persons of all the people, together with their lands, their building lots and all their property." (See old Laws, page 10.) "The same law confirms what has been already stated in relation to the rights of his Majesty the King in all lands. Section 3d requires that every tenant of land shall work thirty-six days in the year for the King or Government, showing clearly that there is no individual who has an allodial title to the soil, that title remaining with the King." (Principles, vol. 2, Stat. Laws, p. 82.) The Commissioners proceed to say that the King could not dispose of the allodium to any other person without infringing on the rights of the superior lord, nor could the lord, if he purchased the allodium, seize upon the rights of the tenants and dispossess them. "It being therefore fully established, that there are but three classes of persons having vested rights in the lands: 1st, the Government, (i. e. the King;) 2d, the landlord; and 3d, the tenant—it next becomes necessary to ascertain the proportional rights of each." (Ibid, p. 83.) The Commissioners, in view of the evidence given, arrived at the conclusion that, should the King allow to the landlord one-third, to the tenant one-third, and retain one-third himself, he, according to the uniform opinion of the wit-nesses, would injure no one unless himself. (Ibid, p. 83.) It was the imperative necessity of separating and defining the rights of the several parties interested in the lands, which led to the institution of the Board of Land Commissioners, and to the division made by the King himself, with the assistance of his Privy Council.

At the death of Kamehameha I., his son Liholiho, Kameha-

meha II., was recognized as King in accordance with his father's express will. Along with the Crown, Kamehameha II. inherited all his father's rights as an absolute sovereign and as suzerain or lord paramount of all the lands in the Kingdom, which rights, unimpaired, descended with the Crown to Kamehameha III. upon the death of his brother and predecessor.

In the year 1839 began that peaceful but complete revolution in the entire polity of the Kingdom which was finally consummated by the adoption of the present Constitution in the year 1852. His Majesty Kamehameha III. began by declaring protection for the persons and private rights of all his people from the highest to the lowest. In 1840 he granted the first Constitution by which he declared and established the equality before the law of all his subjects, chiefs and people alike. By that Constitution, he voluntarily divested himself of some of his powers and attributes as an absolute Ruler, and conferred certain political rights upon his subjects, admitting them to a share with himself in legislation and government. This was the beginning of a government as contradistinguished from the person of the King, who was thenceforth to be regarded rather as the executive chief and political head of the nation than its absolute governor. Certain kinds of public property began to be recognized as Government property, and not as the King's. Taxes which were previously applied to the King's own use. were collected and set apart as a public revenue for Government purposes, and in 1841 his Majesty appointed a Treasury Board to manage and control the property and income of the Government. But the political changes introduced at that period did not affect in the least the King's rights as a great feudal Chief or Suzerain of the Kingdom. He had not as yet yielded any of those rights. It was expressly declared that he should still retain his own lands, and lands forfeited for the non-payment of taxes should revert to him. (Old Laws, p. 12.) Under the first law relating to the descent of lands to heirs, a portion of the lands held by any landlord were at his death to be restored to the King ; and in case the landlord died leaving no heir, his lands and other property belonged to the King, by escheat. (Old Laws, p. 47). Kamehameha III. gave a striking proof of his power as suzerain of the Kingdom, when he re-

sumed the possession of all the fishing grounds within his dominions, for the purpose of making a new distribution of them, with the consent of his chiefs in Council. (Old Laws, p. 36 ; Haalelea *vs.* Montgomery, vol. 2, Haw. Rep., p. 62.)

The laws organizing the executive departments of the Government were enacted in the year 1846. Those laws provided among other things for the establishment of the Board of Land Commissioners, for the purpose of effecting a division of rights in land and of quieting the titles throughout the Kingdom. The subject of rights in land was one of daily increasing importance to the newly formed Government, for it was obvious that the internal resources of the country could not be developed until the system of undivided and undefined ownership in land should be abolished. Several expedients were resorted to with a view to obviate in some measure the existing difficulties, in advance of the action of the Land Commission. With that view the Legislative Council on the 7th November, 1846, passed a series of joint resolutions on the subject of rights in lands, and the leasing, purchasing and dividing the same. (Statute Laws, vol. 2, page 70 ; see Oni *vs.* Meek, Haw. Rep., vol. 2, p. 87.) But it was evident that such expedients could be of but little real benefit, while it must also have been foreseen that the operations of the Land Commission would occupy a long series of years, and that the Commission would encounter much difficulty in settling the rights of the chiefs and konohikis. In the month of December, 1847, the subject was discussed at length in the Privy Council. The record of that discussion is of the highest interest and has been carefully examined by the Court. It was finally resoled by the King in Council to effect, through the assistance of a Committee, a division of lands between the King, as suzerain, and the high chiefs and konohikis, his feudatories. That division appears to have been effected with dispatch, for by the end of February, 1848, it was completed. .

The King had resumed the possession of the larger part of the lands previously in the possession of the chiefs and landlords, and the remainder had been granted to the several hold-ers by freehold title certified to the Land Commission for its formal award, and capable of being converted into an allodial

title, by payment to the Government of a commutation to be fixed in Privy Council.

His Majesty's suzerainty over the lands held by his chiefs and other individuals was then at an end.   He stood possessed of the lands which were in his own hands previous to the division, and of those resumed in the division, constituting together a large part of the landed property of the kingdom—a truly royal domain.   But it is evident from the minutes of the Privy Council, that the lands comprised in that domain were not regarded as the King's private property strictly speaking.   Even before his division with the landholders, a second division between himself and the government or state was clearly contemplated, and he appears to have admitted that the lands he then held might have been subjected to a commutation in favor of the government, in like manner with the lands of the chiefs. The records of the discussion in Council show plainly his Majesty's anxious desire to free his lands from the burden of being considered public domain, and as such, subjected to the danger of confiscation in the event of his islands being seized by any foreign power, and also his wish to enjoy complete control over his own property.   Moved by these considerations and by a desire to promote the interest of his Kingdom, he proceeded with an exalted liberality to set apart for the use of the government the larger portion of his royal domain, reserving to himself what he deemed a reasonable amount of land as his own estate.   To effect that object he signed and sealed on the 8th of March, 1848, two instruments contained in the Mahele Book, the first of which reads as follows :

"E ike auanei na kanaka a pau ma keia palapala, owau o Kamehameha III., no ka lokomaikai o ke Akua, ke 'Lii o ko Hawaii nei pae aina, ua haawi au i keia la no ko'u makemake maoli no, a ua hoolilo a me ka hookaawale mau loa aku i na 'Lii a me na kanaka, ka nui o ko'u aina alii e pono ai a e pomaikai ai ke Aupuni Hawaii, nolaila, ma keia palapala ke hookoe nei au no'u iho a no ko'u poe hooilina a no ko'u poe hope a mau loa aku, na aina a'u i kakauia ma na aoao 178, 182, 184, 186, 190, 194, 200, 204, 206, 210, 212, 214, 216, 218, 220, 222, o keia buke, ua hookaawaleia ua poe aina la no'u a no ko'u poe hooilina a me na hope a'u a mau loa, he waiwai ponoi no'u aole mea e ae."

That instrument we translate into English thus :

"Know all men by these presents, that I, Kamehameha III., by the grace of God, King of these Hawaiian Islands, have given this day of my own free will, and have made over and set apart forever to the chiefs and people the larger part of my royal land, for the use and benefit of the Hawaiian Government, therefore by this instrument I hereby retain (or reserve) for myself and for my heirs and successors forever, my lands inscribed at pages 178, 182, 184, 186, 190, 194, 200, 204, 206, 210, 212, 214, 216, 218, 220, 222, of this book, these lands are set apart for me and for my heirs and successors forever, as my own property exclusively."

The other instrument which was also executed in the Hawaiian language, we translate into English thus : Know all men by these presents, that I, Kamehameha III., by the grace of God, King of these Hawaiian Islands, do hereby give, make over and set apart forever to the chiefs and people of my Kingdom, and convey all my right, title and interest in the lands situated here in the Hawaiian Islands, inscribed on pages 179 to 225, both inclusive, of this book, to have and to hold to my chiefs and people forever.

These lands are to be in the perpetual keeping of the Legislative Council (Nobles and Representatives) or in that of the superintendents of said lands, appointed by them from time to time, and shall be regulated, leased, or sold, in accordance with the will of said Nobles and Representatives, for the good of the Hawaiian Government, and to promote the dignity of the Hawaiian Crown.

By referring now to the confirmatory Act of the 7th June, 1848, it must be apparent to every one, from the close similarity of the language used in said Act with that of the instruments just recited, that the Legislative Council simply intended by that Act to ratify what had been already done by the King in Privy Council, and thereby bind the nation to its faithful observance forever.  We think the Attorney General was mistaken when he said the Act of 7th June, 1848, appeared to have been drafted hastily or inadvertently.  It is within the knowledge of the Court that the Act in question was prepared in the English language by the late Chief Justice Lee, who had taken a promi-

nent part in the discussion of the subject in the Privy Council, and who in common with other councillors appears to have been fully alive to the nature and importance of the business, and knew well the legal import of the language introduced into the Act.

His Majesty King Kamehameha III. had no surviving child of his own, but had adopted his nephew, Prince Alexander Liholiho. In the month of April, 1853, his Majesty, with the consent of the House of Nobles, and in accordance with the 25th Article of the Constitution, publicly proclaimed Prince Liholiho as his successor on the Throne. At the same time he made and executed his last will and testament, declaring his will both in regard to the descent of the Crown and the disposition of his estate. By the first clause of that instrument he declared his will that, Prince Liholiho, his adopted child, should be his heir and successor to the Crown. By the second clause he declared that if Prince Liholiho should not survive him or should become incapacitated under the Constitution, his will was that Prince Lot Kamehameha should be heir to the Throne, and failing him, the Princess Victoria Kamamalu. By the third clause he directed that all his just debts should be paid out of his estate by his executors as soon as convenient after his decease. By the fourth clause he devised to his consort Queen Kalama, certain lands in lieu of dòwer provided she should accept the same. By the fifth clause he devised all his remaining estate to his adopted son Prince Liholiho. His Majesty died on the 15th December, 1854, and was succeeded by Prince Liholiho as Kamehameha IV. The will of Kamehameha III. was duly proved before the Hon. Lorrin Andrews, Judge of Probate, on the 27th day of January, 1855, and the provisions thereof, touching the King's estate, were carried out by the executors.

It is admitted that from the time when Kamehameha III. separated his own property from that of the Government, in 1848, up till his death, he dealt with his reserved lands as his own private estate, leasing, mortgaging or selling the same at his pleasure. Ever since the division, those lands, except such as have been sold, have always been known as the King's lands, and have been managed by an agent or land steward appointed by the King. After the death of Kamehameha III., Queen

Kalama declined to accept the lands devised to her by the King's will, in lieu of dower, on the ground that she had received these lands from him in the division of 1848.  Her right to dower was acknowledged by King Kamehameha IV., who made an amicable arrangement touching the same, by setting upon her a fixed annuity for life, in consideration of which she relinquished her claim for dower by deed.  In the year 1856 the late King married his still surviving consort Queen Emma. No ante-nuptial agreement was made as to their property, nor any provision in the nature of a jointure for the Queen.  During his Majesty's reign, a period of nearly nine years, he constantly dealt with the lands in question as his private property in like manner as his predecessor had done, and her Majesty Queen Emma was always in the habit of joining with him in deeds to individuals, whenever it was necessary that she should do so in order to bar her dower.  On the 30th day of November last, his Majesty died intestate.

Having stated fully all the facts and circumstances which seem to us calculated to throw light on the subject, and to guide the Court in ascertaining the intention of Kamehameha III. as declared in the instrument of reservation of the 8th March, 1848, and in giving a sound construction to the confirmatory act of the Legislative Council, it only remains for us now to announce the conclusions at which we have arrived.

In our opinion, while it was clearly the intention of Kamehameha III. to protect the lands which he reserved to himself out of the domain which had been acquired by his family through the prowess and skill of his father, the conqueror, from the danger of being treated as public domain or Government property, it was also his intention to provide that those lands should descend to his heirs and successors, the future wearers of the crown which the conqueror had won ; and we understand the act of 7th June, 1848, as having secured both those objects. Under that act the lands descend in fee, the inheritance being limited however to the successors to the throne, and each successive possessor may regulate and dispose of the same according to his will and pleasure, as private property, in like manner as was done by Kamehameha III.

In our opinion the fifth clause of the will of Kamehameha III. was not necessary to pass the reserved lands to Kamehameha

IV., any more than the first clause was necessary to pass to him the crown.   He was entitled to inherit those lands by force of the act of 7th June, 1848, when he succeeded to the crown, in virtue of the public proclamation made by his predecessor with the consent of the House of Nobles, and he was entitled as the adopted son of Kamehameha III., to inherit the remainder of his estate not devised to any one else, subject to dower.

We are clearly of opinion also that her Majesty Queen Emma is lawfully entitled to dower in the reserved lands, except so far as she may have barred her right therein by her own act and deed.   There is nothing in the act of 7th June, 1848, which can be understood as taking away the Queen's right of dower in the lands therein named ; nor is there any law of this Kingdom which renders the matrimonial rights of the wife of the King any less than or any different from those of the wife of any private gentleman.   Such was unquestionably the understanding of both Kamehameha III. and his successor as to dower in those lands, which are to be dealt with in all respects as private inheritable property, subject only to the special Legislative restriction on the manner of their descent.

But his Majesty Kamehameha IV. was possessed of other property, both real and personal, at the time of his death, not affected with the special character attached to the reserved lands.   The descent of that part of his estate must be governed by the general law of inheritance and distribution, and her Majesty Queen Emma is therefore entitled as statutory heir to one-half of that property, after the payment thereout of such portion of the late King's debts as are not specifically charged by mortgage or otherwise upon the reserved lands.   Debts of the latter class ought clearly to be paid out of the estate encumbered therewith.

Let judgment be entered accordingly in favor of both the claimants.

Attorney-General Harris, for his Majesty the King.

Messrs. Bates and Montgomery, for her Majesty Queen Emma. May 27, 1864.

N. B.—Since the above decision the Legislature, by the law of January 3d, 1865, have decreed the lands reserved to the Crown. by the Act of 1848, to be henceforth inalienable and not lawful to lease the same for any term of years to exceed thirty.