In the Matter of the Application
of
ELIZABETH COCKETT ROBINSON
To register and confirm her title to land situate at Puunau,
Honokawai and Kaanapali, District of Lahaina, Island
and County of Maui, Hawaii.

No. 4234.

DECEMBER 5, 1966.

RICHARDSON, C.J., CASSIDY, WIRTZ,
LEWIS AND MIZUHA, JJ.

OPINION OF THE COURT BY RICHARDSON, C.J., AND LEWIS, J.

Appellee filed a Land Court application under R.L.H.
1955, c. 342, as amended, to register her title to two lots,
one being the whole of Royal Patent 1862, Land Com-

mission Award 10568, Apana 3 to Oleloa, and the other being a portion of Royal Patents 636 and 4565, Land Commission Award 4552, Apana 5 to Aumai.[1] Each of the patents concededly contained the following provision:

"* * * excepting and reserving to the Hawaiian government, all mineral or metallic mines, of every description."

Because the Land Commission Awards made no mention of mineral rights, the Land Court held that "the reservation of mineral rights in the Royal Patents was null and void." A decree was entered registering the lands under the Torrens System without reservation of the mineral rights, and the State, which had asked that the registration be made subject to such reservation,[2] appealed.

We pass without comment the question whether the applicant was estopped from registering her title without the reservation contained in the Royal Patents,[3] and proceed to the question whether the reservation was and is valid.

The Land Commission Awards were issued by the Board of Commissioners to Quiet Land Titles, hereinafter called the Land Commission, provided for by the Second Act of Kamehameha III, entitled "An Act to Organize the Executive Departments of the Hawaiian Islands," pt. I, ch. VII, art. IV, S.L. 1845-6, p. 107, effective February

---

[1] The record on appeal is an abbreviated one "setting forth only so many of the facts averred and proved or sought to be proved as are essential to a decision of the questions by the supreme court," by agreed statement pursuant to H.R.C.P., Rule 76. The dates of the Land Commission Awards and Royal Patents do not appear.

[2] Specifically, the State prayed "that if the title to the land in the application be registered in the applicant, the said land be made subject to the reservation of all mineral and metallic mines of every description in favor of the State of Hawaii."

[3] It is questionable whether this question has been properly presented by the record on appeal and the specification of error in the opening brief.

7, 1846. Said chapter VII related to the bureau of the land office. S.L. 1845-6, p. 95. By article II of the same chapter it was provided:

"SECTION VI. The form of all royal fee simple patents shall be as follows:

"KAMEHAMEHA ———, by the grace of God, king of the Hawaiian Islands, by this his royal patent, makes known unto all men, that he has for himself and his successors in office, this day granted and given, absolutely, in fee simple unto —————————, his faithful and loyally disposed subject, for the consideration of ———————— dollars, paid into the royal exchequer, all that certain piece of land, situated at ——————, in the Island of —————, and described (*by actual survey or by natural boundaries as the case may be*) as follows: containing ———————— acres, more or less; excepting and reserving to the Hawaiian government, all mineral or metallic mines, of every description.

"To have and to hold the above granted land in fee simple, unto the said —————, his heirs and assigns forever, subject to the taxes to be from time to time imposed by the legislative council equally, upon all landed property held in fee simple.

"In witness whereof I have hereunto set my hand, and caused the great seal of the Hawaiian Islands to be affixed, at Honolulu, this ——— day of —————, 18——.

"(L.S.)    —————————    ——————————.
"Attest, ——————    ——————————,
Premier."
(S.L. 1845-6, pp. 100-01.)

The Land Court held that this section applied "only to grants by the government and not patents issued on awards." As will appear, the correctness of this conclu-

sion is the controlling issue here.

By section V of article IV (the article creating the Land Commission), it was made the special duty of the Land Commission to advertise a prescribed form of public notice, containing *inter alia* the following:.

"Patents in fee simple, or leases for terms of years, will be issued to those entitled to the same, upon the report which we are authorized to make, by the testimony to be presented to us."

(S.L. 1845-6, p. 108.)

As indicated by the form of public notice, the objective of the Land Commission was to determine who were entitled to land patents. Sections IX and XI of article IV provided for the issuance of patents "pursuant to the terms in which the said board shall have confirmed their respective claims," and "in accordance with the award * * *." S.L. 1845-6, p. 109. Upon issuance of the patent, the patentee held the legal title, and one claiming under the award contrary to the patent had only such rights as equity would give him. *Davis* v. *Brewer,* 3 Haw. 270; *Davis* v. *Brewer,* 3 Haw. 359, 361; *Laanui* v. *Puohu,* 2 Haw. 161.

By section 3 of the Act of July 20, 1854, it was provided that a Land Commission Award "shall be final and binding upon all parties, and shall be a good and sufficient title to the person receiving such award, his heirs and assigns, and shall furnish as good and sufficient a ground upon which to maintain an action for trespass, ejectment or other real action, against any person or persons whatsoever, *as if the claimant, his heirs or assigns, had received a Royal Patent for the same * * *."* S.L. 1854, p. 21. (Emphasis added.) Whether before the enactment of this statute a Land Commission Award without a patent conferred as good a title as one with a patent we need not say, for it is certain that both before and after the enact-

ment of the statute a Land Commission Award without a patent conferred no better title than one with a patent.

By section 1 of the Act of July 29, 1872, S.L. 1872, c. 21,[4] it was provided that all Royal Patents issued upon Land Commission Awards should be "in the name of the person to whom the original award was made, even though such person be deceased or the title to the real estate thereby granted have been alienated; And all Royal Patents so issued shall inure to the benefit of the heirs and assigns of the holder of such original award." This eliminated the problem presented in *Davis* v. *Brewer, supra,* 3 Haw. 270, of issuance of a patent to one subsequently alleged not to be in fact the successor in interest of the awardee, and caused the court in *Brunz* v. *Minister of Interior,* 3 Haw. 783, 787, to remark that the doctrine of *Davis* v. *Brewer* had been modified by the 1872 Act, and that "Patents based on awards do not therefore confer or confirm titles."

It is apparent that by a combination of the 1854 and 1872 acts,[5] patents based on Land Commission Awards have been reduced in importance to a mere release of the government commutation.[6] But it would be a bootstrap

---

[4] This is now R.L.H. 1955, § 100-11.

[5] The opinions rendered after the dates of these acts have not always been meticulous in spelling out the statutory source of the doctrine that a patent based on a Land Commission Award is a mere release of the government commutation. See, *e.g., Minister of Interior* v. *Papaikou Sugar Co.,* 8 Haw. 125. However, in such cases it was not important that this be spelled out.

[6] The government commutation, pursuant to the Principles of the Land Commission, adopted as hereinafter set forth, was as follows:

"6th. The share of government, or the body politic, to be commuted for with the Minister of the Interior, by any confirmed claimant wishing to obtain a fee simple title under chapter 7 of part first of the Act to organize the Executive Departments, this Board understand, from the evidence adduced before them, to be one third part of the value of the land, without improvements, which third part of unimproved value, being paid by the confirmed claimant, should extinguish the private rights of the King in the land, and leave such claimant an allodium, subject only to the corporate rights of the

operation to interpret a Land Commission Award as other than what it originally was—a determination of a right to a patent. The governing point, therefore, is the form of patent contemplated when the award was made.

On August 20, 1846, the Land Commission adopted a set of principles by which it would be guided. These were approved by a resolution of the Legislative Council October 26, 1846, whereby it was "enacted, that from the date hereof, all claims for landed property in this kingdom shall be tested by those principles, and according to them be confirmed or rejected." S.L. 1847, p. 94. Turning then to the authoritative principles of the Land Commission we find that the Commissioners took cognizance of, and deemed themselves limited by, any "principle in past legislation" applicable to the point under consideration. S.L. 1847, p. 90, para. 3d. This conclusion stemmed from section VII of the article creating the Land Commission, which provided that "the decisions of said board [the Land Commission] shall be in accordance with the principles established by the civil code of this kingdom." (S.L. 1845-6, p. 109), and from the definition of "civil code" contained in "General Provisions of the Act to Organize the Executive Departments," which provided that:

"Section III. Until the passage of the civil code,

---

body politic, to be exerted by the King under authorization of the laws, and through the agency of his officers created by the laws. * * * They [claimants] had a possessory right under the crown, equal to two thirds undivided of the value of the land, provided there were no tenants; and in consideration of the undivided third of the King, they paid an annual rent, in produce of the soil, and in service. * * * That rent can be sold by the Minister of the Interior, for not exceeding one third of the unimproved value of the land as aforesaid, which would divest the land so commuted for of all interference, save that of the community, for the causes and in the way aforesaid."

(S.L. 1847, p. 93.)

See *Minister of Interior* v. *Papaikou Sugar Co.*, *supra*, 8 Haw. 125, holding that the commutation was to be based on the value of the land as of the date of the award, and referring to the Principles of the Land Commission.

the principles of the foregoing act, and the prescriptions of all the civil statutes now existing not at conflict therewith, shall serve and be binding as a civil code for this kingdom * * *." (S.L. 1845-6, p. 270.)

While the statutory provision for adherence of the Land Commission to the principles of the civil code was in terms limited to enumerated topics, the Land Commission in its adopted principles, after adverting to the above noted statutory provisions, did not apply the maxim *"expressio unius est exclusio alterius"* but on the contrary declared it incumbent upon the Commission, in passing upon the merits of each claim, after eliciting the facts from the witnesses, to "reconcile those facts to the provisions of the civil code, *whenever there is a principle in past legislation applicable to the point under consideration;* but when no such principle exists, they may judicially declare one, in accordance with ancient usage *and not at conflict with any existing law * * *."* S.L. 1847, p. 90, para. 3d. (Emphasis added.) The Commissioners moreover announced that they were not at liberty to disregard "certain restrictions contained in the same Act, by the 4th Article of the 7th chapter of the first part of which they are created," and that: "Aliens[7] are not allowed to acquire any allodial or fee-simple estate in lands." S.L. 1847, p. 90, para. 5th. The matter of aliens' rights was not enumerated in section VII of the article creating the Land Commission, which made applicable the principles established by the "civil code," meaning, "the prescriptions of all the civil statutes."

---

[7] The Second Act of Kamehameha III, by the 4th article of the 7th chapter of the first part of which the Land Commission was created, provided in section III of article II of said 7th chapter, S.L. 1845-6, p. 100, that: "It shall in no case be lawful to grant lands in fee simple, within this kingdom, to aliens * * *," and provided in section IV of article I of chapter V of part I of the same act, S.L. 1845-6, p. 76, that: "* * * aliens * * * are not able to acquire any allodial or fee simple estate in lands." Subsequently, by the Act of July 10, 1850 (S.L. 1850, p. 146), aliens were made eligible to acquire land in fee simple.

Thus the Land Commission deemed the precept established by section VII to be of general application and not limited to the enumerated topics. Pursuant to this precept, the prescriptions of all the civil statutes were binding on the Land Commission whenever applicable. It would be incompatible with this precept were we to hold that section VI of article II, prescribing the form of "all royal fee simple patents," did not govern Land Commission Awards as well as other dispositions. While some sections of this article II related to the sale of government land at a price, section VI relating to the form of patent was not limited to that subject matter. Our conclusion that the provisions of article II as to the form of patent governed Land Commission Awards as well as other dispositions is confirmed by section 7 of the Joint Resolution of November 7, 1846 (S.L. 1847, p. 70 at 71), which provided for the issuance of a patent "in accordance with Act 2, part 1, chapter 7, article 2" to a konohiki desiring to have his portion of an ahupuaa or ili set off to him "according to his rights in the same." As interpreted in *Territory* v. *Gay,* 26 Haw. 382, 403, this operated in respect of Land Commission Awards when the commutation was settled in kind. The November, 1846 legislation, coming as it did on the heels of the October, 1846 approval by the Legislative Council of the principles adopted by the Land Commission, manifested the legislative understanding that a patent in the form prescribed by article II would be the end result of the settlement of rights then in progress.

A further point made by the Land Court in its decision was that "the ownership of mines or minerals is not included in the category or classification of 'sovereign interests' or 'corporate rights of the body politic,' " the court here evidently referring to the principles adopted by the Land Commission on August 20, 1846, wherein it was stated that the King had not conferred upon the Land

Commission "his sovereign prerogatives as head of the nation" (S.L. 1847, p. 85), and that as more fully stated in note 6, *supra,* payment of commutation would extinguish the right to rent, and leave the claimant an allodium, "subject only to the corporate rights of the body politic" (S.L. 1847, p. 93). The sovereign prerogatives, or as otherwise put, the corporate rights of the body politic, were by the Land Court held to be "only such items as powers of taxation, of eminent domain or the like, commonly thought of as 'political powers' as distinguished from proprietary interests." Appellee so argues in this court. The argument overlooks the proposition that the Land Commission was merely speaking of the stability of titles which would result from its proceedings in effectuation of the new laws, as compared with the former system. See *Knudsen* v. *Board of Education,* 8 Haw. 60, discussed *infra.* It was emphasizing that under the new system the corporate rights of the body politic nevertheless would remain. The Land Commission was not saying that the Royal Patents issued on its awards would be any more comprehensive than other Royal Patents issued under the new laws.

This was a time of formulation of land titles. Claimants before the Land Commission could receive no better title than was offered pursuant to law. There is nothing to show that the government was offering to such claimants a better title than it was willing to sell.

It is important to note that it was government property that was being disposed of by the Land Commission proceedings. The nature of land tenures prior to the making of the Land Commission Awards must be considered. As stated in *Estate of His Majesty Kamehameha IV.,* 2 Haw. 715, 720:

"In the year 1839 began that peaceful but complete revolution in the entire polity of the Kingdom which was finally consummated by the adoption of the present

Constitution in the year 1852. His Majesty Kamehameha III. began by declaring protection for the persons and private rights of all his people from the highest to the lowest. In 1840 he granted the first Constitution by which he declared and established the equality before the law of all his subjects, chiefs and people alike. By that Constitution, he voluntarily divested himself of some of his powers and attributes as an absolute Ruler, and conferred certain political rights upon his subjects, admitting them to a share with himself in legislation and government. This was the beginning of a government as contradistinguished from the person of the King, who was thenceforth to be regarded rather as the executive chief and political head of the nation than its absolute governor."

By the Constitution of 1840 it was declared:

"The origin of the present government, and system of polity, is as follows: KAMEHAMEHA I, was the founder of the kingdom, and to him belonged all the land from one end of the Islands to the other, though it was not his own private property. It belonged to the chiefs and people in common, of whom Kamehameha I was the head, and had the management of the landed property. Wherefore, there was not formerly, and is not now any person who could or can convey away the smallest portion of land without the consent of the one who had, or has the direction of the kingdom." (The Fundamental Law of Hawaii, p. 3.)

Claimants before the Land Commission presented their claims "against the King or Government, as the source of all title." *Thurston* v. *Bishop,* 7 Haw. 421, 431. Claimants had no titles, and the act creating the Land Commission "provided a method by which titles could be obtained." *Id.* at 433. The claimants theretofore held merely "a

possessory right under the crown,"[8] "a qualified right of possession to lands."[9] The nature of this right was explained in *Knudsen* v. *Board of Education, supra,* 8 Haw. 60, where the court recognized the authority, during the period when land matters were in the course of settlement, of early laws not in accordance with what would be deemed permissible under present day notions. Sustaining a "quasi right of eminent domain" under which lands had been taken for school purposes without compensation, the court stated:

"We must bear in mind that it was not until the organization of the Commission to Quiet Land Titles, which was accomplished by the general statutes of 1846, the chiefs and people had any titles to land; and it was not until 1848 that the Mahele or great division was made, by which the interests of the King, chiefs and people in the lands of the Kingdom were separated, followed by the final act of the King ceding to the Government a portion of his reserved lands." (8 Haw. at 63.)

The government or state was meant when the Land Commissioners spoke of the King in the principles adopted by the Land Commission. *Thurston* v. *Bishop, supra,* 7 Haw. at 430. Thus, when the Commissioners spoke of their power "to alienate for him any rights, which he as King could surrender in regard to these lands" (S.L. 1847, pp. 84-85), and when they further stated that by their appointment there had been conferred upon them by the King "all his private and public power in lands claimed by private parties, which in the nature of things he can delegate" (S.L. 1847, p. 87), the Land Commissioners were referring to the government.

---

[8] Quoted from the principles adopted by the Land Commission, S.L. 1847, p. 93.

[9] Quoted from *Thurston* v. *Bishop, supra,* 7 Haw. at 433.

The power over government property thus bestowed on the Land Commission was not unregulated by law, and the Land Commission so recognized. It was within the framework of the governing laws that the Land Commission was to fix the "terms" of the awards. This authority, conferred by section IX of article IV (S.L. 1845-46, p. 109), must be considered in the light of the section as a whole, whereupon it appears that leases as well as patents were to be issued by the Minister of the Interior to claimants "pursuant to the terms in which the said board shall have confirmed their respective claims * * *." The Land Commission could award a lease or some other right; for example in *Kalama* v. *Kekuanaoa,* 2 Haw. 202, there was involved a Land Commission Award of a right of residence for life in one third of certain Fort Lands, the court deciding that the award ran to one Kailio and not to Kalama.

As part of the framework within which the Land Commission operated, mineral or metallic mines could not be disposed of, by virtue of the prescribed form of patent. The effect of this prescribed form of patent was to make the mineral rights reservation self-effectuating. *Argo Oil Corp.* v. *Lathrop,* 76 S.D. 70, 72 N.W.2d 431, 76 S.D. 555, 82 N.W.2d 504; *Hough* v. *Porter,* 51 Or. 318, 388, 95 Pac. 732, 98 Pac. 1083, 1091; *United States* v. *Washington,* 233 F.2d 811, 817 (9th Cir.) ; *United States* v. *Joyce,* 240 Fed. 610 (8th Cir.) ; *cf., Knudsen* v. *Board of Education, supra,* 8 Haw. 60, 64. Compare *Shaw* v. *Kellogg,* 170 U.S. 312; *United States* v. *Price,* 111 F.2d 206 (10th Cir.).

We recognize that the Land Commission had judicial powers. *State* v. *Hawaiian Dredging Co.,* 48 Haw. 152, 178, 397 P.2d 593, 608; *Kanaina* v. *Long,* 3 Haw. 332, 335; *Kahoomana* v. *Moehonua,* 3 Haw. 635, 640. No such powers were called into play here. The Land Commission simply decided who was entitled to a patent in the form prescribed by law. Accordingly, the reservations contained

in the Royal Patents here involved were valid; the Land Commission Awards were subject thereto when made. No mention of the mineral rights was necessary in the Land Commission Awards since the reservation would be, as in fact it was, contained in the patents. The decree of registration should have provided for the notation of a reservation as prayed.

It is contended that from and after 1900 land patents were issued on Land Commission Awards without the mineral rights reservation, and that there have been Land Court registrations prior to this one in which such reservation has not been claimed by the Territory or State. From the contentions made at the oral argument, disinterest in the mineral rights on the part of government officials appears to have been at a time when there was no "reason to focus attention on the question." *Cf., United States* v. *California*, 332 U.S. 19, 39-40. At all events, the matters referred to could not affect the result in this case, in which the mineral rights reservation does appear in the patents. The waiver of the mineral rights reservation, if authorized in the instances mentioned, would not operate in other instances where no such waiver was attempted. The question is simply one of the validity of the reservation in the patents here involved. Moreover, the matters referred to are not of record and are not before us. At the oral argument counsel for appellee offered to supplement the record in this respect. Such supplementation would not be appropriate. It would go outside the issues presented by the appeal, as framed by the agreed statement under H.R.C.P., Rule 76.[10]

---

[10] The parties agreed that the question on appeal was:

"Are the reservations of all mineral and metallic mines in favor of the Hawaiian Government (State of Hawaii) contained in the Royal Patents valid, when no such reservations were contained in the Land Commission Awards, and the Royal Patents were issued pursuant to the Land Commission Awards?"

Appellee notes that section VI of article II, chapter VII, part I, Second Act of Kamehameha III, prescribing the form of patent, above quoted, was repealed upon the enactment of the Civil Code of 1859. This, it is argued, shows the government's disinterest in the mineral rights, but as seen that point is not significant. The repeal was effected by C.C. 1859, § 1491, which provided that: "From and after the day upon which the provisions of this Code shall take effect,[11] the following statutes shall be considered as repealed," the enumeration including the above quoted section VI along with almost all of the Second Act of Kamehameha III. At the same time, C.C. 1859, § 43,[12] provided:

"SECTION 43. A Royal Patent, signed by the King, and countersigned by the Kuhina Nui and the Minister of the Interior, shall issue under the great Seal of the kingdom to the purchaser in fee simple of any government land or other real estate; and also to any holder of an award from the Board of Commissioners to quiet land titles for any land in which he may have commuted the government rights."

The effect of this repeal was prescribed by C.C. 1859, § 22,[13] which provided:

"SECTION 22. The repeal of any law shall, in no case, affect any act done, or any right accruing, accrued, acquired or established, or any suit or proceeding had or commenced in any civil case, before the time when said repeal shall take effect."

The repeal of section VI of article II therefore did not invalidate the reservations contained in these patents, whether or not the patents were issued after the date of

---

[11] The Civil Code of 1859 took effect August 1, 1859. C.C. 1859, § 1492.

[12] As amended, this section is now R.L.H. 1955, § 99-16.

[13] This section is now R.L.H. 1955, § 1-13.

the repeal.[14] Each patent was issued upon a Land Commission Award already made.[15] Such award established the right to a patent in the form prescribed by section VI of article II, and the repeal did not enlarge the right already established. *Cf., United States* v. *Magnolia Petroleum Co.,* 276 U.S. 160. Moreover, C.C. 1859, § 5,[16] provided that: "No law shall have any retrospective operation." This in itself precluded application of the 1859 law to change the rights of awardees. *Cf., Waiakea Mill Co.* v. *Vierra,* 35 Haw. 550; *United States* v. *Hemmer,* 241 U.S. 379.[17]

Reversed and remanded for entry of a modified decree in conformity herewith.

*Andrew S. O. Lee,* Deputy Attorney General (*Bert T. Kobayashi,* Attorney General, with him on the briefs) for appellant.

*Thomas W. Flynn,* for appellee.

---

DISSENTING OPINION OF CASSIDY, J., WITH WHOM WIRTZ, J., JOINS.

I respectfully dissent.

Appellant contends, and the majority agree, that a

---

[14] We do not have before us the question of whether a waiver of the mineral rights reservation, by omission of the same from the patent, would have been authorized after the date of the repeal. No such waiver was attempted as to these awards.

[15] While the dates of the awards do not appear in the record transmitted to this court, they necessarily antedated the dissolution of the Land Commission on the last day of March, 1855, pursuant to the Act of July 20, 1854, S.L. 1854, p. 21, *supra.*

[16] As amended, this is now R.L.H. 1955, § 1-6.

[17] A situation comparable to the present one arose in Alaska upon the repeal by the Alaska Omnibus Act (Pub. L. 86-70, sec. 21(d) (7), 73 Stat. 141) of a congressional enactment requiring the reservation of rights-of-way (61 Stat. 418). In litigation since this repeal no point has been made of it. See *Hillstrand* v. *State,* 181 F. Supp. 219 (D. Alaska), *interloc. review denied,* 352 P.2d 633 (Alaska); *Myers* v. *United States,* 210 F. Supp. 695 (D. Alaska), *aff'd in part and rev'd in part,* 323 F.2d 580 (9th Cir.). This confirms our view that the repeal of section VI of article II is not significant in this case.

Land Commission award made pursuant to the provisions of Article IV of Chapter VII of Part I of the Second Act of Kamehameha III was, as a matter of law, automatically subject to the same reservation of "mineral rights"[1] as is set out in the form of patent prescribed for the sale of Government lands by Section VI of Article II of the same chapter, notwithstanding the Land Commission's award was made without any such reservation. I am unable to follow the reasoning of the court or to agree with its conclusion in reaching that result. Upon consideration of the pertinent statutory provisions in light of fundamental principles established by our early cases on Hawaiian land law I find myself in full accord—with the Land Court's holding that Section VI of Article II applied "only

---

[1] As is seen from the text of Section VI of Article II set out in the court's opinion, the prescribed reservation was of "all mineral or metallic mines, of every description." What this language means is not before us but it is obvious that the insertion of the reservation in the form of patent for Government lands was some foreigner's idea as it is certain that minerals, metals, or mines played no part in the economy or life of Hawaii at the time. It has only been within the last 15 years that the existence of minerals in quantity in the soil of the Hawaiian Islands has come to light and the possibility of the exploitation of such resources has been recognized. See S.L.H. 1957, J.R. 30. Legislation regulating mining, adopted in 1957 and 1963, now appears as R.L.H. 1955, Chs. 98C and 99A (1965 Supp.).

Many interesting and informative reports on the existence of minerals in the soils of the Hawaiian Islands are available. They include: U.S. Department Interior Bureau of Mines Report 6003 on "Metallurgical Testing of Hawaiian Ferruginous Bauxites" (1962) ; Stanford Research Institute Report March 1957 on "Some Problems in the Evaluation of Hawaiian Bauxite Reserves ;" "Special Publication No. 1, Hawaii Agricultural Experiment Station University of Hawaii June 1954 on "Some of the Mineral Resources of the Hawaiian Islands" by Sherman ; Industrial Research Advisory Council Report on "Deposits of Titanium Oxide in the Hawaiian Islands" (February 1954) ; Territory of Hawaii Economic Planning and Coordination Authority Report on "A Preliminary Evaluation of Titanium Ore and Clay Deposits in the Hawaiian Islands" (April 1957).

While it is made evident from these reports that there are extensive deposits of titanium and bauxite in the state there appears to be no prospect for the present economic development of these resources due to many factors including the grade and location of the deposits and the excessive cost of extracting and processing. Only time will determine whether any economic development will be feasible. If such occurs it undoubtedly will become necessary to judicially determine whether or not the reservation upheld by the court in this case applies to open mining extraction of bauxite or titanium.

to grants by the government and not patents issued on awards" and that the reservations of mineral rights contained in the three patents in this case were ineffectual.

Decisions of the Land Commission were subject to appeal to the supreme court and when no appeal was taken a decision of the Commission was final. Art. IV, Sec. VII.[2] Unless appealed, an award was "binding upon the minister of the interior and upon the applicant." Art. IV, Sec. I. Further, the Minister of Interior was mandated to issue patents to claimants of land "pursuant to the terms in which the said board shall have confirmed their respective claims," and "in accordance with the award of said commissioners." Art. IV, Secs. IX, XI.

A patent issued on a Land Commission award evidenced the release of commutation due the Government. The award vested and determined the extent of the claimant's title.

As stated in *Brunz* v. *Minister of Interior*, 3 Haw. 783, 787, "Patents based on awards do not therefore confer or confirm titles." And, in *Minister of Interior* v. *Papaikou Sugar Co.*, 8 Haw. 125, 126, "The award confirmed title to the land. There remained outstanding, however, the interest of the Government therein." That interest was extinguished by the payment of commutation and the patent was issued in evidence thereof. "A Royal Patent is merely a quit claim of the interest of the government in lands." *Mist* v. *Kawelo*, 11 Haw. 587, 589.

In *Minister of Interior* v. *Papaikou Sugar Co., supra,* it is stated (at p. 127) : "The law governing these matters is found in the 'Principles adopted by the Board of Commissioners to Quiet Land Titles in their adjudication of claims presented to them,' pp. 81 to 94, Vol. 1, Statute of

---

[2] Unless otherwise indicated, statutory references herein by article and section only will be to the provisions of Ch. VII of Part I of the Second Act of Kamehameha III.

1846—enacted as law October 26, 1846."

One of the fundamental principles adopted by the Land Commission was for the contemplated division of land of the Kingdom into three parts, viz., one-third retained for the King or Government, another third to the landlords or chiefs, and the remaining one-third to the tenants or common people. This basic formula and the foundation upon which it rested are explained in the Commission's prefatory remarks to the Statement of Principles (Laws 1847, pp. 82-83), as follows:

"It seems natural then, and obviously just, that the King, in disposing of the allodium, should offer it first to the superior lord, that is to the person who originally received the land in trust from the King; since by doing so, no injury is inflicted on any of the inferior lords or tenants, they being protected by law in their rights as before; and most obviously the King could not dispose of the allodium to any other person without infringing on the rights of the superior lord. But even when such lord shall have received an allodial title from the King by purchase or otherwise, the rights of the tenants and sub-tenants must still remain unaffected, for no purchase, even from the sovereign himself, can vitiate the rights of third parties. The lord, therefore, who purchases the allodium, can no more seize upon the rights of the tenants and disposses them, than the King can now seize upon the rights of the lords, and dispossess them. This appears clear, not only from the first principles of justice, but also from the act of 1839, declaring protection for tenants as well as for landlords. That act particularly recognizes but three classes of persons as having rights in the sale, viz: the King or government, the landlords and the tenants. Indeed, section 9, chapter 3 of that statute positively forbids the lord who receives land

in trust from the King to place another lord under himself, over the tenants. If then any landlord violate this law, he only divides his own rights; he cannot thereby diminish the rights of the King or government, nor the rights of the tenants.

*"It being therefore fully established, that there are but three classes of persons having vested rights in the lands,—1st, the Government, 2nd, the landlord, and 3d, the tenant, it next becomes necessary to ascertain the proportional rights of each."* (Emphasis added.)

That Land Commission awards to landlords or tenants were intended, upon satisfaction of commutation, to be of full and absolute title, without reservation except only as to corporate rights of the body politic as authorized by law, is plainly laid down by the Sixth Principle adopted by the Land Commission, as follows:

"6th. The share of Government, or the body politic, to be commuted for with the Minister of the Interior, by any confirmed claimant wishing to obtain a fee simple title under chapter 7 of part first of the Act to organize the Executive Departments, this Board understand, from the evidence adduced before them, to be one third part of the value of the land, without improvements, *which third part of unimproved value, being paid by the confirmed claimant, should extinguish the private rights of the King in the land, and leave such claimant an allodium, subject only to the corporate rights of the body politic, to be exerted by the King under authorization of the laws,* and through the agency of his officers created by the laws. The Board, in asserting this principle, do not mean, however, to restrict the power of His Majesty in Privy Council, to fix upon a less commutation, under section 10th of the article creating this Board, and subject to

the rights of tenants, if there be any on the land; for the King has no power to convey away the rights of individuals without their consent. They deem it their duty to state the maximum value of the interest retained in all lands of the kingdom at this date, which was never relinquished, and which the Government to this day has never received any valuable consideration for, even from the private chiefs from whom the claimants derive. Claimants cannot derive more than the original proprietor had, neither could the original proprietors grant more than they had to the present claimants. They had a possessory right under the crown, equal to two thirds undivided of the value of the land, provided there were no tenants; and in consideration of the undivided third of the King, they paid an annual rent, in produce of the soil, and in service. The foreign claimants, deriving from these, have not, in all cases, paid the rent which was due from their grantors, and have lost sight of the corporate rights in their lands, pertaining originally to the government. *That rent can be sold by the Minister of the Interior, for not exceeding one third of the unimproved value of the land as aforesaid, which would divest the land so commuted for of all interference, save that of the community, for the causes and in the way aforesaid."* (Laws 1847, p. 93.) (Emphasis added.)

No serious contention is made or can be made that a reservation of mineral rights in lands subject to a Land Commission award could be justified on the basis that such a reservation was of a corporate right of the body politic under authorization of law and therefore automatically applicable to a Land Commission award by virtue of the provisions of the Sixth Principle. The Land Court properly concluded that the corporate rights referred to in the quoted principle are sovereign rights and

include "only such items as powers of taxation, of eminent domain or the like, commonly thought of as 'political powers' as distinguished from proprietary interests."

As has been noted, under the provisions of Article IV the Minister of Interior in issuing a patent on a Land Commission award was required to do so in accordance with and pursuant to the terms of the award. In issuing such a patent he performed a purely ministerial function. *Territory* v. *Liliuokalani*, 14 Haw. 88, 104. The Minister of Interior had no power beyond that to be found in the express provisions of the law. *Brunz* v. *Minister of Interior, supra*, 3 Haw. 783, 788.

In view of the foregoing it is my conclusion that unless there were some authority in law, beyond the provisions of Article IV, requiring or authorizing the reservation of mineral rights to the Government in lands covered by Land Commission awards, the reservation of such rights in a patent issued on an award would be, as the Land Court decreed, "null and void." *Cf., Shaw* v. *Kellogg*, 170 U.S. 312, cited in the court's opinion.

The majority accept appellant's contention that the reservation prescribed by Section VI of Article II applied likewise to patents the Minister of Interior was required to issue pursuant to Section IX of Article IV. And in this connection it is said that "While some sections of this Article II related to the sale of government land at a price, section VI relating to the form of patent was not limited to that subject matter." This conclusion, with which I take issue, is one of the main props upon which the court's opinion necessarily rests. In my view, Article II—and every section of it—applied only to Government lands.

The subject matter of Article II is clearly specified and delimited by its title, reading: "Of the Disposition of Government Lands." As the very term denotes, "Gov-

ernment lands" were lands that were to be set apart and retained as the public domain.[3]

The primary function of the Land Commission was to separate and establish the ownership of lands into the three classes designated in the basic formula set out in the declaration of the Land Commission above quoted. One of the classes, as has been seen, was the Government, which then meant the King.[4] The lands to be so retained by the King in his sovereign capacity as distinguished from the lands to be awarded to individual landlords or tenants under Article IV, were to be State or public property in the division contemplated by the Second Act of Kamehameha III. The actual division however, was not effectuated until the Mahele of 1848 and the concomitant act of Kamehameha III in ceding a major portion of his reserved lands to the Government. As is summarized in *Knudsen* v. *Board of Education,* 8 Haw. 60, 63: "We must bear in mind that it was not until the organization of the Commission to Quiet Land Titles, which was accomplished by the general statutes of 1846, the chiefs and people had any titles to land; and it was not until 1848 that the Mahele or great division was made, by which the interests

[3] The lands to which Article II was to apply are designated as the "public domain" in Section X of Article I, reading: "The minister of the interior shall, in like manner, cause to be ascertained and defined, all landed property in the respective islands at the time of the passage of this act, belonging in any wise to the government of the Hawaiian Islands; which landed property, together with any and all tracts ceded, as hereinbefore contemplated, shall be in his possession as the public domain of His Majesty, for the purposes defined in the second article of this chapter."

[4] In *Thurston* v. *Bishop,* 7 Haw. 421, 430, it is stated: "The whole context of these 'Principles' shows that the land tenures of this Kingdom were to be settled on the basis that the King—meaning the State or Government—had one-third of any given land held by a landlord (generally a chief) ; and if it had tenants upon it (if all parts of the land were equally valuable) the landlord would take one-third, and the tenants the remaining third. An allodial title would be given by the Land Commission to the lord (the chief), an allodial title in severalty to the tenants, and a third would remain in the King or Government. The terms 'King' and 'Government' are, as we see, used interchangeably. They mean the 'State' in each case."

of the King, chiefs and people in the lands of the Kingdom were separated, followed by the final act of the King ceding to the Government a portion of his reserved lands.[5] See also *Estate of His Majesty Kamehameha IV,* 2 Haw. 715; *Harris* v. *Carter,* 6 Haw. 195.

Section I of Article II provides: "The minister of the interior shall have power to contract for the absolute sale, *in fee simple,* of any government land, at a price to be in each instance agreed upon in privy council, under sanction of the king, and when so agreed upon, to be conveyed to the purchaser by royal patent, as hereinafter prescribed."

The form of the patent referred to in Section I of Article II is prescribed by Section VI of the article and is obviously couched in language for a grant upon payment by the grantee of a monetary consideration and not as "a

---

[5] In King, "Real Property Appraisers Manual" (1942) the exclusive nature of "Government lands" is explained at p. 4, as follows:

"Even before the king's division with the chiefs, a second division between himself and the government was clearly contemplated. Certainly the king was entitled to lands in his own right as a chief together with the other chiefs, and he realized as well how desirable it was that there be a public domain, the proceeds of the sales and leases of which should go to the national treasury, and from which his subjects could purchase the lands which they needed. Accordingly on the day after the final division was made with the last chief, the king made a further division of the lands which had been surrendered to him, setting apart about two-thirds of them for the government and reserving the remainder for himself as his own private estate. The former are known as GOVERNMENT LANDS and the latter as CROWN LANDS.

 *  *  *  *  *

"The Land Commission completed its labors and was dissolved on March 31, 1855, and all its records, books and unadjudicated claims were deposited with the Minister of Interior. These records are now on file in the office of the Commissioner of Public Lands. As a result of the work of the Land Commission, the Mahele between the king and the chiefs and the further division between the king and the government, original titles of all lands in Hawaii are derived from but three sources, namely, Land Commission Awards including awards on chiefs' and commoners' lands, from the sales of government lands and from the sales of crown lands."

Government lands is defined in Chinen, "Original Land Titles in Hawaii" (1961), at p. 50, as follows:

"GOVERNMENT LANDS: This term, as distinguished from Crown Lands and Konohiki Lands, refers to those lands set apart to the Government by King Kamehameha III on March 8, 1848, which action of the King was confirmed by the Legislature on June 7, 1848."

452

quit claim in confirmation of an award" for which the patentee had commutated his title. See *Territory* v. *Gay*, 26 Haw. 382, 392.[6]

Considering the language of the several sections of Article II in light of the meaningful title of the article, I can reach no other conclusion than that the patent form prescribed by Section VI thereof, and consequently the reservation of mineral rights contained in it, applied only to Government lands disposed of on a bargain and sale basis. It is my view that Article II is framed to so directly and expressly limit its application to Government lands as to preclude the application of any of its provisions to lands subject to Land Commission award. I am also of the opinion that a contrary result can not be indirectly obtained by any process of inductive reasoning.

I am unable to see any pertinency in Section 7 of the Joint Resolution of November 7, 1846 (Laws 1847, p. 71) incidentally relied on by the court. By its terms that section applied to a konohiki seeking "his portion of any given Ili or ahupuaa set off to him * * *." No contention is made by the State, nor does the record permit a holding, that the lands involved in this case would have qualified for treatment under Section 7 of the resolution. Further, the resolution of November 7, 1846 became functus by 1850, if not earlier. See *Oni* v. *Meek*, 2 Haw. 87; *Territory* v. *Gay, supra*, 26 Haw. 382.

I have no intention or desire to oversimplify but, if I analyze the court's opinion correctly, its main thrust is formulated in the inductive process I will endeavor to summarize in the next paragraph hereunder.

The Land Commissioners' cognizance that they were

---

[6] The patents in this case have not been made a part of the record. However, the difference between the recitals in the premises of a patent issued in confirmation of a Land Commission award under Article IV and a patent for a sale of Government land made pursuant to Article II is shown by the forms set forth at pages 22 and 28 in Chinen, "The Great Mahele" (1958).

limited by "any principle in past legislation"[7] stemmed
from Section VII of Article IV which provided that, "The
decisions of said board shall be in accordance with the
principles established by the civil code of this kingdom,"
and moreover, the commissioners announced that they
were not at liberty to disregard "certain restrictions con-
tained in the same act, by the 4th Article of the 7th chapter
of the first part of which they are created," and that
"Aliens are not allowed to acquire any allodial or fee-
simple estate in lands." And since the matter of aliens'
rights was not enumerated in Section VII of Article IV,
*ergo:*

> "Thus the Land Commission deemed the precept
> established by section VII to be of general application
> and not limited to the enumerated topics. Pursuant
> to this precept, the prescriptions of all the civil statutes
> were binding on the Land Commission whenever appli-
> cable. It would be incompatible with this precept were
> we to hold that section VI of Article II, prescribing
> the form of 'all royal fee simple patents,' did not govern
> Land Commission awards as well as other dispositions."

I think the court stretches a point in discounting the
maxim, *Expressio unius est exclusio alterius,* in its con-
sideration of Section VII of Article IV. That section was
definitely limited to enumerated topics. It read: "The
decisions of said board shall be in accordance with the
principles established by the civil code of this kingdom in
regard to prescription, occupancy, fixtures, native usages
in regard to landed tenures, water privileges and rights

---

[7] The full text of the Land Commission's statement on the point is:
"A wide latitude is thus left to the Commissioners, who must, in passing
upon the merits of each claim, first elicit from creditable witnesses, the
facts or history of each; and thus assort or reconcile those facts to the
provisions of the civil code, whenever there is a principle in past legis-
lation applicable to the point under consideration; but when no such
principle exists, they may judicially declare one, in accordance with
ancient usage and not at conflict with any existing law, nor at variance
with the facts, and altogether equitable and liberal." (Laws 1847, p. 90.)

454

of piscary, the rights of women, the rights of absentees, tenancy and subtenancy—primogeniture and rights of adoption; which decisions being of a majority in number of said board, shall be only subject to appeal to the supreme court, as prescribed in the act to organize the judiciary, and when such appeal shall not have been taken, they shall be final." Construction of this section appears to be a classic instance calling for the application of the maxim above referred to and I see no justification for inferring that the Land Commission deemed it otherwise.

Obviously, there was no principle in past legislation on mineral rights, nor did the Land Commission judicially declare one on the point. Further, establishment of a precept that the Land Commission did not deem Section VII to be limited to the enumerated topics by virtue of its having declared that aliens were not allowed to acquire allodial title rests on, to say the least, a flimsy bottom. The Land Commission's adoption of that restriction was not generated from taking liberties with Section VII of Article IV but rather rested upon and was required by the specific and generally applicable restriction set forth in Section IV of Article I of Chapter V of Part I of the Second Act of Kamehameha III, as follows:

"All aliens shall, as in Great Britain and the United States of America, continue to be under the following disabilities:

\* \* \* \* \*

"3. They are not able to acquire any allodial or fee simple estate in lands."

Being unable to accept the "precept" created by the court, I find no justification for its use in engrafting the mineral rights reservation to Land Commission awards.

With all deference I make one further general comment. I am inclined to the view that while no mention

in the court's opinion is made of the State's contention that the rule of strict construction applies against the landowner in this case, the court's opinion nevertheless is rendered on that basis.

The State cites *Slidell* v. *Grandjean,* 111 U.S. 412, and *Coosaw Mining Co.* v. *South Carolina,* 144 U.S. 550, for the rule that where a statute operates as a grant of public property to an individual, the statute should be strictly construed in favor of the sovereign interest. While the rule may be appropriate in some situations, it has no application here. The rule is wholly at odds with the tenet expressed in the preamble to the Principles of the Land Commission, as follows: "From the fact that His Majesty, the intrinsic proprietor, has reposed in this Board, such power of confirming or rejecting, the Commissioners must infer that he intended the utmost liberality to prevail towards the claimants, rather against the pecuniary interests of the body politic than against those of the claimants." (Laws 1847, p. 90.) See *Brunz* v. *Minister of Interior, supra,* 3 Haw. 783; *Minister of Interior* v. *Papaikou Sugar Co., supra,* 8 Haw. 125.

I would affirm the decree of the Land Court.