37 P.3d 603

**Robert Norton MORAN, Plaintiff–Appellant,**

v.

**Walter P. GUERREIRO, as Special Administrator of the Estate of Nuha Kahalewai, Deceased; as Special Administrator of the Estate of Nana Kahalewai, Deceased; as Trustee Under the Last Will and Testament of Manuel Guerreiro, Deceased; and Individually, Defendant–Appellee,**

and

**John Does 1–50, et al., Defendants.**

No. 22910.

Intermediate Court of Appeals of Hawai'i.

Nov. 29, 2001.

■■■■■■■■■■■■

Stephen T. Hioki, on the briefs, for plaintiff-appellant.

Walter P. Guerreiro, defendant-appellee, pro se (no brief submitted).

BURNS, C.J., WATANABE, and FOLEY, JJ.

Opinion of the Court by WATANABE, J.

The lawsuit underlying this appeal was brought by Plaintiff–Appellant Robert Norton Moran (Moran or Mr. Moran) to enforce a contract for the sale of real property and to obtain damages resulting from the alleged breach of the contract. Applying its "inherent equity and supervisory powers as well as its inherent power to control the litigation process[,]" the Circuit Court of the First Circuit (the circuit court) dismissed Moran's complaint with prejudice, and set aside an agreement that had been reached to settle the lawsuit.

We conclude that the circuit court did not err in setting aside the settlement agreement. However, we conclude that the part of the circuit court's order that dismissed Moran's complaint with prejudice must be set aside. We remand for further proceedings consistent with this opinion.

## BACKGROUND

### A. *The Contract*

Moran is a licensed real estate broker. It appears from the record that on August 16, 1990, Moran and Defendant–Appellee Walter P. Guerreiro (Guerreiro or Mr. Guerreiro) signed a Deposit, Receipt, Offer and Acceptance (DROA) (the August 16, 1990 DROA), by which Moran agreed to purchase, and Guerreiro agreed to sell, certain real property located in Hale'iwa, O'ahu (the subject property) for $495,000.00.[1]

Thereafter, it was apparently discovered that Guerreiro could not convey clear title to the entire subject property, which consisted of three separate parcels. Parcel 1, identified under Tax Map Key (TMK) 6–2–004–029 and title to which stemmed from Land Commission[2] Award (L.C.Aw.) No. 7342, included 14,475 square feet of land. Pursuant to an order entered by the circuit court in Special Proceeding No. 86–1007, Guerreiro, as Trustee under the Last Will and Testament of Manuel Guerreiro, Deceased (Manuel's Estate), had the authority to sell Parcel 1. Guerreiro, as Trustee for Manuel's Estate, held similar authority to sell Parcel 2, title to which stemmed from L.C. Aw. Nos. 2725, 2692, 3940, 2699, and 3373 B. Parcel 3, which encompassed about two-thirds of an acre and title to which stemmed from L.C. Aw. No. 2752, was owned as follows:

- Estate of Nuha Kahalewai, Deceased (Nuha's Estate), undivided 2/18th interest;
- Estate of Nana Kahalewai, Deceased (Nana's Estate), undivided 2/18th interest;
- Lydia Sharpe (Sharpe), undivided 1/18th interest;
- Guerreiro, as Trustee for Manuel's Estate, undivided 13/18th interest.

---

1. The August 16, 1990 Deposit, Receipt, Offer and Acceptance (DROA) is not in the record on appeal, so we are unable to confirm the $495,000.00 price.

2. The "Second Act of Kamehameha III, entitled 'An Act to Organize the Executive Departments of the Hawaiian Islands,' pt. I, ch. VII, art. IV, S.L. 1845–6, p. 107, effective February 7, 1846[,]" provided for the establishment of the Board of Commissioners to Quiet Land Titles, commonly referred to as the Land Commission. *In Matter of Application of Robinson*, 49 Haw. 429, 430–32, 421 P.2d 570, 572–73 (1966). The purpose of the Land Commission was to investigate and finally ascertain or reject "all claims of private individuals, whether natives or foreigners, to any landed property acquired anterior to the passage of this Act." J. Chinen, *The Great Mahele: Hawaii's Land Division of 1848* 8 (1958) (internal quotation marks omitted).

Claimants before the Land Commission presented their claims "against the King or Government, as the source of all title." *Thurston v. Bishop*, 7 Haw. 421, 431. Claimants had no titles, and the act creating the Land Commission "provided a method by which titles could be obtained." *Id.* at 433.
*In Matter of Application of Robinson*, 49 Haw. at 438, 421 P.2d at 576.

Parcels 2 and 3, which encompassed a total of 211,384 square feet of land, had been consolidated for tax assessment purposes under TMK 6–2–004–003.

The subject property thus included lands under two TMK numbers, title to which stemmed from a total of seven awards by the Land Commission (hereafter, L.C. parcels).

Sharpe was alive when the August 16, 1990 DROA was executed. To rectify his inability to convey clear title to the subject property, Guerreiro sought and obtained orders from the circuit court, dated June 20, 1991, in Special Proceeding Nos. 91–208 and 91–207, naming himself as Special Administrator for Nuha's and Nana's Estates, with authority to sell the respective interests of those estates in Parcel 3.

Following the signing of the August 16, 1990 DROA and the entry of the orders naming Guerreiro as Special Administrator for Nuha's and Nana's Estates, Guerreiro's then-attorney prepared a deed by which the various undivided interests in the subject property would be conveyed to Moran. Sharpe signed and acknowledged the deed before a notary public on May 7, 1992. Guerreiro was to sign the deed as Special Administrator for Nuha's and Nana's Estates and as Trustee for Manuel's Estate at the closing of escrow on the subject property. It appears, however, that the closing never occurred, in part, because Moran could not obtain the necessary financing.

By a letter to Guerreiro dated June 29, 1993, Moran proposed terms for a new DROA for the subject property. The letter stated, in relevant part, as follows:

This letter is a proposal to purchase the subject property ... and, if approved, it would replace the old DROA which would then be null and void.

In hopes of finalizing this deal I am prepared to make a new offer to replace the old contract dated August 16, 1990. This is *not* a cancellation of the existing contract.

I have based my figures on the following material facts which affect the property and I have done a development analysis based on these facts.

First, as you know, I have been trying to secure financing for this transaction for quit [sic] some time. I have tried all avenues and several different companies. Even companies that specialize in higher risk, short term investment loans. Due to the nature of the circumstances that affect this property and the overregulation and credit crunch we are experiencing in the lending industry my efforts have not been successful.

However, since you have been so patient and cooperative and I feel that this still could be a viable deal I would like to proceed with new terms based on the following.

After doing research on the property I discovered that approximately 1/3 of the property lies within the floodway. According to [the Department of Land Utilization], this basically is a non-building zone. The other 2/3 of the property lie within the flood fringe. This basically means that in order to build you must meet strict codes for foundations and lot grading. These are very expensive to have engineered and then to have constructed.... In the present market, it is a risky decision to invest so much money in high tech building for this particular area.

The property does not, as you know, have legal access which is another high risk detraction from future development and sales of the property.

The one redeeming quality of this deal is the ability to reinstate the seperate [sic] Land Court Awards that exist on the map but have been consolidated into one TMK. On this I have not been able to get a straight answer after rigorous inquiry. So this is still uncertain.

These will be the main risk factors I or any other buyer will have to take in the purchase of this property.

With all this in mind and in addition to the present Real Estate market, I am willing to make you a modification proposal as follows.

Total purchase price to be $350,000. $150,000 in cash at closing and the balance of $200,000 to be paid off over three years

at 4% with monthly payments of principal and interest.

If you are in agreement with this modification I am willing to go forward with this purchase in an expeditious manner and set a closing date of July 31, 1993.

This modification offer is good through July 1, 1993 at 6:00 [p.m.]

(Emphasis in original.)

On July 1, 1993, Guerreiro handwrote a counterproposal at the bottom of Moran's letter. Essentially, Guerreiro agreed to Moran's terms but insisted that he be paid an additional $9,378.00, by separate check, to compensate Guerreiro for the rental income he had lost after evicting, at Moran's request, the tenants who had been leasing houses on the subject property.

By a DROA dated July 31, 1993,[3] Moran formalized his offer to purchase the subject property from Guerreiro for $359,378.00, to be paid as follows:

| | |
|---|---|
| $ 15,000.00 | Initial deposit in cash; |
| $ 9,378.00 | Additional cash deposit, to be paid into escrow on or before closing; |
| $150,000.00 | Balance of down payment, to be paid into escrow before closing; |
| $174,378.00 | Total cash funds from Moran (exclusive of closing costs); |
| $200,000.00 | By way of lease option on remaining property, as described in special terms to the DROA. Moran to have 36 months or less to exercise this option, and during this period, Moran to pay $5,904.00 per month rent. Upon exercising this option, all rents except 4% would go toward the principal balance. |

$359,378.00 Total Purchase Price

The special terms that Moran listed in paragraph C–67 of the July 31, 1993 DROA were as follows:

1. This offer does not replace existing offer, dated June 29 & July 1, 1993 unless this offer is accepted. 2. Upon payment of $150,000 Seller to deed to Buyer [L.C. Aws.] 2692, 2725, 3940, 3378–B [sic], 2699 & 2752 shown on tax map. Zone 6, section 2, plat 4, island of Oahu. 3. Upon excercise [sic] of option, Seller will deed to [L.C. Aw.] 7342, TMK 6-2-4 Oahu. 4. During lease option period Buyer will have normal tenant rights to [L.C. Aw.] 7342 and improvements. 5. Buyer to [sic] adddtional [sic] [$]9,378.00 at closing to reimburse Sllers [sic] for lost rental income[.] 6. On execution of this agreement by both parties, both parties agree that the DROA date 8/13/90 [sic] between Moran/Guerreiro becomes null and void[.] 7. The majority of the down payment is coming from the Sale [of] 66–138A Walikanahele. The balance from the buyers [sic] share of the commission and Buyers [sic] deposit[.] 8. Balance of [$]200,000 or less will be from a 1031 [exchange.[4]]

(Footnote added.) Under Moran's proposal, then, Moran would get title to Parcels 2 and 3 at closing, lease Parcel 1 at a monthly rent of $5,904.00, and have a three-year option to purchase the fee interest in Parcel 1 for $200,000.00. Since Moran's proposal provided that upon exercise of the option to purchase Parcel 1, all rents paid by Moran, "except 4%" (the taxes), "would go toward the principal balance," and since $200,000.00 divided by 36 (months) is equal to $5,555.56, Moran, in essence, could obtain title to Parcel

---

3. Lydia Sharpe (Sharpe) was not a party to the July 31, 1993 DROA, and it is not clear from the record on appeal whether she was alive at the time this DROA was executed. Additionally, although the DROA was dated July 31, 1993, it was signed by the parties on August 1, 1993.

4. A 1031 exchange is an exchange of property held for productive use in a trade or business or for investment for property of a like kind which is also to be held for "productive use in a trade or business" or for investment. 14 R. Powell, *Powell on Real Property* § 83A.01, at 83A–5 (2000). Pursuant to 26 United States Code § 1031, which is part of the Internal Revenue Code, a taxpayer may be able to defer recognition of any gain or loss realized on the exchange.

after the three-year lease period just by paying the monthly rent.

Guerreiro proposed a counteroffer to Moran's July 31, 1993 DROA, to "expire on August 2, 1993, 5:00 [p.m.,]" by which he agreed to the $350,000.00 purchase price but wanted the $200,000.00 principal balance to be paid "by way of Purchase Money Mortgage [ (PMM) [5]] for 36 months, at monthly payments of $5,904.80. No pre-payment penalty. [PMM] to be drawn and executed by August 2, 1993, by [Moran]." (Footnote added.) Additionally, Guerreiro included the following special terms in his counteroffer:

(1) Delete items # 1, # 3, # 4, # 5 of Section C–67, page 6 of 7. (2) Buyer to pay additional $11,009.90, by separate check (not through escrow) to reimburse Seller for lost income and taxes as of this date.

Moran accepted Guerreiro's counteroffer by signing the same at 8:00 p.m. on August 1, 1993.

The July 31, 1993 DROA, as amended by the counteroffer, was to close on or before August 9, 1993. However, the transaction did not close as scheduled, apparently because the parties could not agree on the terms of financing and which L.C. parcels the PMM would cover. Additionally, Hawaii Escrow & Title Inc. (Hawaii Escrow), the escrow agent, was unable to order deeds or give title insurance because a survey had to be completed to obtain metes and bounds descriptions for each of the seven L.C. parcels and questions arose concerning Sharpe's interest in Parcel 3.

On December 6, 1993, Guerreiro, in his capacity as Trustee for Manuel's Estate, signed and acknowledged before a notary public six limited warranty deeds by which he conveyed to Moran and Moran's wife title to the lands described in L.C. Aw. Nos. 7342, 2725, 2692, 3940, 2699, and 3373–B, which collectively made up Parcels 1 and 2. Moran

and Guerreiro also signed a handwritten agreement that stated:

To facilitate the closing Moran and Guerreiro agree that the [PMM] & note will be held by escrow and not recorded until the new correct description is available from Takeo Morisato. This is expected by the middle of February. The enclosed moneys will be released and Moran will pay February taxes.

On December 8, 1993, upon advice of counsel, Guerreiro handwrote at the bottom of the handwritten agreement: "This is cancelled— 12/8/93 3:00 PM[.]" The next day, Edward Bybee (Bybee), one of Guerreiro's attorneys, wrote a letter to Moran that stated, in pertinent part, as follows:

Over one year ago you agreed to purchase the [subject] property from [Mr. Guerreiro]. Since then you have repeatedly failed to perform your obligation as the buyer and the transaction has not closed. [Mr. Guerreiro], on several occasions, agreed to grant you extensions and give you accomodations [sic] to help you close the sale and you still failed to perform. In recent months, Mr. Guerreiro imposed deadlines which brought the transaction to still another scheduled closing set for this week.

Yesterday, [Mr. Guerreiro] and I attended a meeting with Denise M. Kaehu [ (Kaehu) ], the escrow agent at [Hawaii Escrow], to sign the documents to close the transaction. Upon examining the documents, however, I discovered that the $200,0000 [sic] [PMM] to go to Mr. Guerreiro (1) encumbered only a small portion of the property to be conveyed to you and (2) was not going to be recorded at the closing, but at a later date in February 1994. Upon inquiry to [Kaehu], I was informed this [PMM] was prepared at your instructions and prepared by your attor-

---

5. A purchase money mortgage (PMM) is a mortgage

held by property owners. The seller-owner usually agrees to hold a mortgage for about the same length of time and rates as an institution. Using such a mortgage, the buyer saves certain closing costs which always accompany a new mortgage from an institution.

A [PMM] is one of the best ways to finance the purchase of a home in a tight money market. It is often to the owner's advantage to take a long-term mortgage for less than the current rate in order to get the highest price for his home.

J. Bagby, *Real Estate Financing Desk Book* 29 (2d ed.1977).

ney. This is not the [PMM] agreed to be delivered to Mr. Guerreiro by you as provided by your purchase agreement. Since the [PMM] is an essential and very significant part of the security to be provided by you to Mr. Guerreiro to assure you will later pay him $200,000 for the property the document you prepared and signed is in direct violation of your Purchase Agreement, and Mr. Guerreiro refused to accept the document.

. . . .

. . . Mr. Guerreiro has, however, agreed to give you *one last chance* to perform and is willing to give you until 5:00 p.m., Monday, December 13, 1993, to perform your purchase. . . .

Mr. Moran, this transaction can still close, but only on the agreed terms of the Purchase Agreement, and if you truly wish to close on those terms, I and Mr. Guerreiro are standing ready to meet with you and your attorneys to finalize all documents.

(Emphasis in original.)

By a letter to Bybee, dated December 10, 1993, Moran responded as follows:

I disagree with the content of your letter. I will assume that when you wrote the letter you did so in ignorance of all the facts. I would like to go over the more important facts with you now.

1. The present agreement to purchase was July 31, 1993 not over 1 year ago.

2. The delays you say I caused were in fact primarily caused by your clients [sic] giving me an incorrect survey and his inability to convey parcel 29[, i.e., Parcel 3].

3. The reason that the [PMM] was to be recorded at a later date was that the survey and legal description of that parcel is incorrect according to Mr. Norm Unten of Takeo Morisato surveyors.

4. According to the DROA the PMM is to cover L.C. Aw[.] 7342:6[, i.e., Parcel 1].[6]

If your client wishes to close this transaction, please provide me and escrow with written confirmation by NOON, December 13, 1993. It is my understanding that Mr. Guerreiro has already signed all pertinent documents.

(Footnote added.) By a letter dated December 13, 1993, Bybee wrote to Moran: "You have defaulted your obligation to purchase in the referenced transaction. The escrow has been terminated, see enclosed letter." The enclosed letter instructed Hawaii Escrow to terminate escrow because Moran "defaulted on his purchase obligations[.]"

B. *The Underlying Lawsuit and the Settlement Agreement*

On January 5, 1994, Moran filed the underlying breach of contract action (Civil No. 94–0044) against Guerreiro, individually, as Special Administrator for Nuha's and Nana's Estates, and as Trustee for Manuel's Estate (collectively, Defendants), seeking damages and/or specific performance of the July 31, 1993 DROA, as amended.

On January 28, 1994, Defendants filed an answer raising eleven defenses,[7] as well as a counterclaim for wilful or intentional breach of the July 31, 1993 DROA, as amended. Moran replied to Defendants' counterclaim on February 16, 1994 and demanded a jury trial, pursuant to Rule 38 of the Hawai'i Rules of Civil Procedure (HRCP).[8]

---

6. We note that in his counteroffer to Plaintiff–Appellant Robert Norton Moran's (Moran) July 31, 1993 DROA, Defendant–Appellee Walter P. Guerreiro (Guerreiro) proposed deleting the item in Moran's offer that would have required Guerreiro to deed to Moran "[Land Court Award] 7342," i.e., Parcel 1, upon Moran's exercise of a lease option. Moran accepted Guerreiro's counteroffer.

7. Among the defenses that Guerreiro raised ·in the answer were the following: failure to join necessary or essential parties, i.e., Sharpe; unclean hands; failure to satisfy all "prerequisites and/or conditions precedent" and/or not being "prepared to perform in accordance with said

agreement"; impossibility of performance; part or all of the contract was obtained through coercion or duress; lack of consideration, fraud, and/or illegality; and waiver, estoppel, misrepresentation, laches and fraudulent inducement.

8. Hawai'i Rules of Civil Procedure Rule 38(b) provides:

(b) **Demand.** Any party may demand a trial by jury of any issue triable of right by a jury by (1) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue, and (2) filing the demand

On March 31, 1997, Guerreiro, now *pro se*,[9] entered into a settlement agreement with Moran on the record, before the circuit court.[10] Essentially, the settlement agreement provided that Moran would purchase the subject property, *as is*, for $205,300.00, with $15,000.00 due "upon signing of the warranty deeds" and the balance of $190,300.00 "paid by way of a [PMM] due in 6 months which would put it at September 30, 1997." Closing was to occur in thirty days, and Moran agreed to pay interest for six months at the rate of four percent interest, with "the final balloon payment on the principal mortgage due on September 30, 1997." The parties also agreed that there would be seven deeds in the name of Moran or his designees, and that the mortgage would be a blanket mortgage covering all seven L.C. parcels.

After the settlement agreement was placed on the record, questions about Guerreiro's ownership of the subject property were raised with the circuit court. The following colloquy then occurred between the circuit court and Guerreiro:

Q. You would warrant and guarantee that you have been the owner of this property. You are currently the owner of this property from the period July 31, 1993 to the present?

A. There is one little hitch in there.... One of the parcels is a two third acre parcel and it is not fully owned by [Manuel's Estate]. [Manuel's Estate] owns about 72 percent of it.

And there is [Nana's Estate] of which I was appointed as the administrator.... So I have the power to sell that. I believe

that is twelve percent of that little two thirds acre property.

And there is a little portion of, I believe, 6 percent that is owned by [Sharpe]. And I believe Mr. Moran knows more about [Sharpe's] share of that little portion.

THE COURT: Well, do you know something about these properties that raise these questions?

A. Robert Kunz [ (Kunz)[11]] had [Sharpe] sign papers for the sale of that. Who he signed it to and who the realtor [Kunz] transferred it to, I don't know.

Q. Does Mr. Moran know?

A. I don't know. That wasn't my real concern. That is my concern. I know this [Sharpe] involved kept doing the title search. It shows that.

. . . .

THE COURT: Mr. Moran [sic] can only transfer to you properties that he has interest in, in accordance with his ownership of these properties in this case. If he owns property in a different capacity, that, maybe, that may affect his property.

. . . .

[MORAN]: I believe the document is sitting in escrow, Your Honor, but I am, I can't sit here and tell you for hundred percent certain they are. I didn't know we get a settlement been going on a few weeks now that we are having one. I am willing to agree to it in principle with everything except that particular point. Because owning a property 82 percent is not owning a property.

THE COURT: What is going to happen to the settlement if this one property is a problem?

as required by Rule 5(d). Such demand may be indorsed upon a pleading of the party. Where by statute a jury trial is allowed on appeal to the circuit court from the prior determination of any court or administrative body, a trial by jury may be had if demanded in the notice of appeal, and if not demanded in the notice, the appellee may have a trial by jury by filing a demand within 10 days after the case is docketed in the circuit court.

9. Guerreiro was initially represented in the underlying lawsuit by Edward Bybee (Bybee) and Nelson Chang (Chang). Subsequently, a different attorney was substituted for Bybee and

Chang. On February 28, 1997, Judge Gail Nakatani (Judge Nakatani) notified Guerreiro that his new attorney had been suspended from the practice of law for failing to pay his bar dues. Thereafter, Guerreiro's appearances in this lawsuit were *pro se*.

10. Judge Nakatani presided over the hearing at which the settlement agreement was orally placed on the record.

11. Robert Kunz apparently was Guerreiro's real estate agent at the time the August 16, 1990 DROA was signed.

[MORAN]: I don't know. It's a problem. That's the thing. I thought like Mr. Guerreiro that [Kunz] got [Sharpe's] signature.

[GUERREIRO]: [Kunz] got Sharpe's signature.

THE COURT: Well, Mr. Guerreiro can't sell, what [sic] not his—

[MORAN]: He already has. He already did sell it. There was no disclosure that it wasn't his at the time he sold it. So now we're trying to rectify that along with other things.

THE COURT: He may have done that but he can't legally do that. You can't force him to legally do something he's not legally capable of doing.

[MORAN]: I am trying.

[MORAN'S ATTORNEY]: We can follow up on [Sharpe's] document, whatever was signed. We're assuming that Mr. Guerreiro will cooperate in his best efforts and capacity as the, I think, special administrator for both [Nana's and Nuha's Estates].

A. Yes, I am their representative.

[MORAN'S ATTORNEY]: Then you will be cooperating with us.

A. . . . . I will be cooperative, I swear.

[MORAN'S ATTORNEY]: Two Kahalewai residences as well as [Guerreiro's].

A. Yes.

Q. Whatever you can help on [Sharpe] you will do that, too?

A. Yes.

(Footnote added.)

On April 30, 1997, a written settlement agreement prepared by Moran's attorney was signed by Moran and Guerreiro, individually, as Special Administrator for Nuha's and Nana's Estates, and as Trustee for Manuel's Estate. The settlement agreement included fifteen terms. Among the terms that are relevant to this appeal are the following:

1. *Guerreiro shall sell [the subject property] to Moran by way of a warranty deed for each [L.C. Aw.] (7 total)* which shall be signed on or before April 30, 1997, which is hereby designated as the closing date for escrow. Escrow shall be at [Hawaii Escrow];

. . .;

3. Moran shall pay to Guerreiro the total amount of $205,300.00 as follows:

a. $15,000.00 (presently held by [Hawaii Escrow]) after the signing of warranty deeds on April 30, 1997, and

b. $190,300.00 through a [PMM] at 4% per annum simple interest on $205,300.00 from March 31, 1997 to April 30, 1997 with interest only payment due on April 30, 1997; at 4% per annum simple interest on $190,300.00 from May 1, 1997 to September 30, 1997 with interest only payment due on the 30th day of each month commencing on May 30, 1997, and ending on September 30, 1997; and with the principal amount of $190,300.00 due on September 30, 1997;

. . .;

5. *Guerreiro warrants and represents to Moran that he is owner of [the subject property] and that he has not transferred or encumbered said property from July 23, 1993 to date;*

6. Moran is purchasing [the subject property], "as is";

. . .;

8. *Guerreiro will cooperate with Moran to secure the approval of [Sharpe] or her heirs or assigns or transferors for the transfer of her interest to Moran or his designees [.]*

(Emphases added.)

Thereafter, by a letter dated May 20, 1997, Guerreiro informed Moran's attorney, in relevant part, as follows:

I was just informed that the family of the late [Sharpe] refuse to sell their portion of the two third acre parcel . . . [.]

This creates a snag in the settlement agreement.

I recommend that we go ahead with the agreement as planned, but delete this parcel.

So, the agreement should read only six parcels, and I will hold on to this parcel and keep paying its property taxes until the Sharpe family have a change of heart.

I hope you and/or [Mr. Moran] will see it in your hearts to keep the purchase price as is, since you are already getting a super good deal.

Remember the original offer was $495,000.00.

On September 2, 1997, Moran's attorney wrote to Guerreiro, proposing a new settlement in lieu of pursuing another lawsuit. Among the terms suggested to Guerreiro were the following:

1. You will sell to Mr. Moran the property that is the subject matter of the above-mentioned law suit [sic] by way of a warranty deed for each [L.C. Aw.] (7 total), but excluding the [Sharpe] interest;

2. Mr. Moran shall designate the names of each owner for each [L.C. Aw.] prior to the closing date for escrow;

3. The purchase price shall be $208,000.00;

4. Mr. Moran will pay you the monies held in escrow ($15,000.00) through escrow upon closing. You will be responsible for the escrow fees and costs which shall be paid from said escrow funds;

5. Said balance of the purchase price shall be subject to simple interest accruing at the rate of 4% per annum commencing from the date of recordation;

6. The balance of the purchase price (the price after the credit from the escrow funds) shall be paid to you over a period of 10 years starting from the date of recordation;

7. For the first 30 months of payments, the payments shall be made to you at the rate of $643.33 per month starting from 30 days from the date of recordation;

8. For the remaining 90 months of payments the payments shall be made to you at the rate of $1,954.03 per month starting from 30 days from the 31st month of payments;

9. Each designated owner shall sign the [PMM] which shall cover all seven [L.C. Aws.];

10. Guerreiro warrants and represents to Moran that he is owner of [the subject property] and that he has not transferred or encumbered said property from July 23, 1993 to date;

11. Moran is purchasing [the subject property], "as is"[.]

Guerreiro did not respond to or accept these proposed terms.

On October 3, 1997, the circuit court [12] held an on-the-record "chamber conference" to check on why "the settlement of this case has not been carried out." Discussion ensued regarding the validity of the deed that Sharpe had signed in 1992, prior to her death. Moran's attorney expressed his opinion that

[the Sharpe] deed ... may be subject to probate at this time because the transaction was never consummated. No probate has been opened. And even if it was, for some reason, valid, which we don't think it is, it's not in the various parcels that my client can ask be placed in the various names. So that deed is totally worthless. And as far as we're concerned, that prior transaction was the subject matter of litigation. And when [Sharpe] signed it, it was for that earlier agreement which gave rise to the present litigation.

What I think Your Honor may have been confused between the escrow officer and possibly Mr. Guerreiro was, somehow, [Sharpe] had signed it post settlement agreement. That's not true. [Sharpe] had been dead already. And Mr. Guerreiro has admitted that he cannot get the cooperation of the heirs. And we would be in violation, I think, of our own rules of court if I attempt to push that deed through when we know that [Sharpe] has died.

. . . .

THE COURT: What are your intentions about this settlement?

[MORAN'S ATTORNEY]: What we had done was on the 2nd of September, I sent Mr. Guerreiro a letter saying, you know, with this new development where he cannot—I mean he can't sell it to anyone now. It's basically a major problem. We would be willing to work something out

---

12. Judge Nakatani presided.

where the price is reduced essentially, and he'll—

THE COURT: What's the point in reducing the price if he can't sell the property to begin with if you say that?

[MORAN'S ATTORNEY]: He would then move to get some sort of quiet title action against the heirs. But we're going to do it legally. We're going to make sure that whatever interest they have, if they want to get paid off, they'll get paid off. But we can't just ignore—I mean it's a real problem. And Mr. Guerreiro knows it.

THE COURT: All right, Mr. Guerreiro, if this is a problem, what are your intentions? What do you want to do?

[GUERREIRO]: What I would like very much is to cancel this whole thing with this [sic] people. They had about five years to buy it. They don't seem to want to buy it. They want to steal it.

Anyway, [Sharpe] was taken to the bank and signed this document, which just resurfaced, by the realtor. He personally took [Sharpe] to the bank and had her sign and notarized [sic]. And now all of a sudden, this document is not any good. The heirs of [Sharpe] don't want to even bother with this little thing 'cause it's so insignificant. They may all realize three dollars, and they say phooey with that. They understand that [Sharpe] already signed this document to sell the thing and get rid of it. But it disappears, and all of a sudden, it resurfaced.

Because of the uncertainty surrounding Sharpe's interest, the circuit court gave the parties one month to close the sale and warned that an order to show cause would be issued if closing did not occur. The circuit court also warned, "If I determine that Mr. Moran has not acted in good faith in closing the sale—because my information is that we're awaiting for the note and mortgages; that's supposed to come from you-I will dismiss this complaint."

At the outset of the continued hearing on February 13, 1998, the circuit court announced:

This basically is scheduled to be an order to show cause hearing because the settlement agreement between the parties

have [sic] not been carried out and the closing of the sale in accordance with that agreement has not closed. The court has been presented with a stipulation for dismissal with prejudice as to all claims and parties.

The circuit court then asked Guerreiro, who had signed the stipulation, whether he understood that "there is a condition to this" stipulation. Guerreiro responded, "I don't understand anything. I just want to get rid of it. I just want to stop this. That's all. I'm under the doctor's care right now, and I just want to get it over with. That's all."

Moran's attorney then informed the circuit court that what prompted the stipulation was that on December 15, 1997, Moran filed a new complaint against Defendants in Civil No. 97–5086–12 to enforce the April 30, 1997 settlement agreement. According to the attorney, it was Moran's plan that after this case (Civil No. 94–0044) was dismissed pursuant to the stipulation, Moran would pursue "whatever rights, claims, defenses that are available under the settlement agreement ... in [Civil No. 97–5086–12]" "by way of a jury trial[.]"

The circuit court refused to accept the stipulation, on grounds that it was already authorized to enforce the settlement agreement. The circuit court further rejected Moran's request to proceed immediately to a jury trial and Moran's request that the circuit court judge recuse herself on grounds that she was privy to privileged communications obtained during settlement negotiations.

The order to show cause hearing then proceeded. Kaehu, a Hawaii Escrow vice president, testified that escrow for the July 31, 1993 DROA transaction was initially opened on November 3, 1993. The transaction did not close, however, because "[t]here were [a] couple of title problems that had to be taken care of regarding probate estates" and "then the—the terms of the transaction changed, and there were—was disagreement between the buyer and seller as to the terms." Subsequently, Kaehu testified, she received instructions to "proceed with escrow pursuant to the terms and conditions set

forth in the settlement agreement" between Moran and Guerreiro, dated April 30, 1997, pursuant to which the purchase price was lowered to $205,300.00. However, Kaehu stated, the sale of the subject property pursuant to the settlement agreement was being held up because of Moran's failure to provide the balance of the conveyance documents, the PMMs, and instructions as to whose names were to be on the title to the different deeds.

On cross-examination, Kaehu confirmed that she had in her possession a notarized deed signed by Sharpe on or about May 7, 1992, which purported to convey the subject property to Moran. Kaehu was questioned by Moran's attorney as to the continued validity of the deed:

Q. And at the time that you received the settlement agreement in evidence as exhibit 1, was it your understanding that [Sharpe] had already passed away?

A. Yes.

Q. Given those circumstances, would you agree, ... that [Sharpe's] interest in the subject property, given that she had passed away, would be subject to probate proceedings?

A. Probate proceedings are commenced on her behalf by her heirs. I had spoken with her heirs. They have no intention of opening up probate proceedings. But from a title standpoint, since she executed the document and had it notarized prior to her death, the conveyance is still valid.

Kaehu further testified that although Guerreiro still needed to sign the deed already signed by Sharpe, he could sign the deed at closing of escrow. The following colloquy then ensued between Moran's attorney and Kaehu as to the need for probate proceedings to be instituted for Sharpe:

Q. [Kaehu], is it your testimony today that notwithstanding the wishes of [Sharpe's] heirs and that there was no probate opened for [Sharpe] and that you knew [Sharpe] had passed away, is it your testimony today that it was a proper escrow practice to have the transaction go forward with [Sharpe's] deed dated in 1992?

A. Yes, her signatures were obtained when the initial file was opened prior to any litigation being commenced. She was aware of the transaction prior to her death.

Q. .... Was she aware of the terms of the settlement agreement in evidence as exhibit 1 when you decided that it was appropriate to file her deed dated in 1992?

A. Number one, I have not filed her deed with anyone. Number two, she could not be aware of a settlement agreement because she was deceased.

Q. And yet, it was still your belief that even though the deceased person that signed a deed back on May 30th, 1992 was not aware of the settlement agreement that it's still proper escrow procedure to file a deed of a deceased person who had apparently died prior to the settlement agreement being signed by [Moran] and [Guerreiro], correct?

. . . .

[Kaehu]: Okay. Let me go back. Okay. I am aware of [Sharpe] being deceased. I had a conversation with Mr. Guerreiro in regards to the amount of money. Mr. Guerreiro had verbally agreed that one-eighteenth percentage [sic] of the net sales price would be allotted and held in escrow in the event that the heirs decided to open and pursue a probate so that we could interplead and turn the money in to the probate court if they so designed.

Q. (By [Moran's attorney]) ... But my question was whether or not you still consider it to be proper escrow procedure to allow a deed to be filed when [Sharpe] did not know the contents of the settlement agreement which were entered into after her death.

A. I don't believe that it would have any effect because of the fact that the percentage amount that would be withheld on [Sharpe's] behalf would not be any different even though the sales price has changed and dropped. It was to be held based on the original amount of the [$]350,000 of the one-eighteenths interest so that there would not be a problem with anyone.

Q. You're assuming, of course, that [Sharpe] would have agreed that the one-eighteenth retention would be something that she was agreeable to, correct?

A. It was my intention, in a very early conversation with her, that she would be receiving proceeds based on a one-eighteenth percentage [sic] interest based on [$]350,000.

. . . .

As I stated, even though the sales price in the settlement agreement has been reduced, escrow was going to withhold the original amount.

Q. One-eighteenth of three hundred—

A. Fifty.

Q. —fifty thousand dollars?

A. Yes.

Q. And what instructions or consent did you have from any of the parties to do this in writing?

A. As of this date, I did not obtain Mr. Guerreiro's permission in writing because litigation began, and I stopped all work on the transaction.

. . . .

Q. Now, let's see if I understand this correctly; that you're going to withhold by verbal agreement one-eighteenth of the original purchase price, and this is after there was indication to you by Mr. Guerreiro that the [Sharpe] heirs did not want to sell, is that correct?

A. [The Sharpe] heirs never informed me they did not want to sell. I spoke to her heirs. They said they were aware of the sale. They were not interested in obtaining or had no interest or benefit for the money that would be held in escrow, and because they do not have enough money, they do not want to start a probate proceeding.

Q. I see. So was it your intention to hold the monies for the [Sharpe] portion of the transaction in escrow?

A. Yes.

Q. For how long a period, ma'am?

A. Forever if that's—until someone claimed—lay claim to it or if they opened a court proceeding, we would turn it over—interplead, turn it in to court.

Upon further questioning, Kaehu testified that it was her understanding that Hawaii Escrow's underwriting section did not believe there would be a problem recording the deed signed by Sharpe and issuing an owner's title policy to Moran. The circuit court thereafter continued the hearing to February 26, 1998 so that it could be determined whether Hawaii Escrow could indeed obtain title insurance for the subject property, notwithstanding the death of Sharpe and the apparent reluctance of Sharpe's heirs to cooperate with the transaction.

At the February 26, 1998 continued hearing, Thomas Rosenberg (Rosenberg), a representative of Hawaii Escrow, testified that Hawaii Escrow could not issue title insurance. Rosenberg stated, in pertinent part:

I spoke with the underwriter, your Honor, after I received copy by fax of a letter that Mr. Guerreiro sent to [Moran's attorney]. The underwriter's position is they aren't willing to insure at this time notwithstanding the fact that [Sharpe] signed a deed, obviously prior to her death. The reasoning being that the heirs of [Sharpe] had indicated pursuant to the letter that Mr. Guerreiro sent to [Moran's attorney] that they aren't willing to go forward with the transaction. No. 2, there has not been a probate of [Sharpe's] estate to determine who the heirs are.

The circuit court nevertheless concluded that the inability to obtain title insurance did not preclude the sale of the subject property because under the settlement agreement, Guerreiro did not bear the risk that the heirs would not cooperate. The circuit court then continued the case to April 17, 1998 for a full evidentiary hearing and again directed the parties to settle.

Prior to the April 17, 1998 hearing, Moran's attorney filed a sworn statement that Guerreiro had been properly served with the new complaint in Civil No. 97–5086–12 on January 24, 1998, had failed to answer, and, as a result, default had been entered against Guerreiro on March 3, 1998. Moran's attorney also indicated that a motion for default judgment in Civil No. 97–5086–12 had been

filed against Guerreiro on March 5, 1998, but that "[a]t the hearing on the motion for entry of default judgment, the Honorable Steven Nakashima[, acting circuit court judge,] continued the hearing pending the outcome of the hearing on the Order to Show Cause set before Judge [Gail] Nakatani [ (Judge Nakatani) ]."

On April 17, 1998, the circuit court convened the continued hearing on the order to show cause. Kaehu testified that she had not received any documents or instructions from either of the parties since the last hearing. She also testified that prior to the last hearing, it was her understanding that Sharpe's heirs were intending to cooperate with the sale of the property. The hearing was then continued to May 26, 1998.

At the May 26, 1998 hearing, both Guerreiro and Moran testified. Guerreiro related that in accordance with the settlement agreement, he had contacted Sharpe's granddaughter and was informed that the family did "not want to be bothered; and [he] respected their wishes and did not bother them since." Guerreiro admitted that he knew there were other heirs of Sharpe but made no effort to contact them.

Moran testified that pursuant to the settlement agreement, $15,000.00 of his money was being held at Hawaii Escrow, but Guerreiro had not signed the warranty deeds. Moran further explained that he was unable to get financing for the remaining balance because "it was [his] belief and [his] understanding that no lending institution would lend it unless they could get title insurance on the property. And without the Sharpe interest, there would be no title insurance issued, ... and later that was verified by Hawaii Escrow."

On further examination by the court, Moran testified that he did not believe that he knew that Sharpe was dead when he signed the settlement agreement. He stated, "I believe I found out when I started getting the correspondence after the signing of the agreement[.]" Moran added that after receiving Guerreiro's letter saying that

Sharpe's heirs refused to transfer their interest in Parcel 3, he made no effort to contact the heirs because he was concerned that he "would run the risk of being accused of screwing up the settlement agreement by alienating them." At the close of the hearing, the circuit court orally dismissed the complaint with prejudice and set aside the settlement agreement.

On June 9, 1998, the circuit court[13] filed its written order dismissing the complaint with prejudice and setting aside the settlement agreement. The circuit court found and concluded, in relevant part, as follows:

### FINDINGS OF FACT

1. The parties entered into a [DROA] on July 31, 1993 for the subject property in the amount of $350,000.

2. Said sale transaction did not close in accordance with the DROA. [Moran] failed to provide for the preparation of the conveyance and mortgage documents.

3. Although [Guerreiro] did not sign the [Sharpe] deed, he was not obligated to do so in advance of closing in accordance with the DROA or the Settlement Agreement and has not otherwise refused to sign the [Sharpe] deed.

4. One of the reasons the sale did not close in accordance with the DROA was because of the [Sharpe] interest.

5. On January 5, 1994, the complaint was filed herein alleging that [Guerreiro] breached the terms of the DROA.

6. A Settlement Agreement dated April 30, 1997 was entered into between [Guerreiro] and [Moran]. The Settlement Agreement was prepared by [Moran's] attorney.

7. The Settlement Agreement provided for the purchase price of $205,300 plus interest, with final payment due on September 30, 1997.

8. The sale in accordance with the Settlement Agreement never closed in spite of the court's demands and numerous exten-

13. Judge Nakatani entered the June 9, 1998 "Order to Dismiss Complaint with Prejudice and Setting Aside Settlement Agreement[.]"

sions. Again no closing documents were prepared by [Moran] to effectuate the closing.

9. Paragraph 1 of the Settlement Agreement provides that ["Guerreiro] shall sell [the subject property] to Moran by way of a warranty deed[.]"

10. Paragraph 5 of the Settlement Agreement provides as follows:

"Guerreiro warrants and represents to Moran that he is owner of [the subject property] and that he has not transferred or encumbered said property from July 23, 1993 to date";

11. Paragraph 8 of the Settlement Agreement provides, in relevant part, as follows:

"Guerreiro will cooperate with Moran to secure the approval of [Sharpe] or her heirs or assigns or transferors for the transfer of interest to Moran or his designees."

12. [Guerreiro] contacted an heir of [Sharpe] and was informed that the family of [Sharpe] did not wish to sell her interest.

13. On the other hand, [Kaehu] informed [Moran] that the family of [Sharpe] did not want to get involved with attorneys or the courts; however, they were probably willing to have [Guerreiro] appointed personal representative of the [Sharpe] estate.

14. [Moran] undertook no action to secure the approval of [Sharpe's] heirs or assigns or transferors for the transfer of [Sharpe's] interest. [Moran's] testimony that he did not know of [Sharpe's] death before signing the Settlement Agreement is not credible.

15. [Moran] never submitted a written application for financing under the Settlement Agreement and never obtained a rejection for financing. [Moran] orally discussed the matter of financing with GE Electric.

16. By ... letter dated September 2, 1997, [Moran] proposed new terms of a settlement and purchase. The new terms provided for a $15,000.00 down payment and owner financing of $193,00.00 [sic]

over a period of 10 years at the interest rate of 4% per annum. One year's interest on a principle [sic] of $193,00.00 [sic] at 4% per annum is $7,720.00.

17. The total proposed payout under the new terms was $210,162.60 which is computed as follows:

Escrow Funds ...................... $ 15,000.00
30 months interest only payments at
 $643.33 per month ............... 19,299.90
90 months of payments at
 $1,954.03 per month ........... 175,862.70

 TOTAL .................... $210,162.60

Under [Moran's] new terms he would be paying only $2,162.60 of interest over the 10–year term of the loan.

. . . .

19. On December 15, 1997, [Moran] filed another complaint against [Guerreiro] alleging breach of the Settlement Agreement. On March 3, 1998, [Moran] filed a Request for Entry of Default against [Guerreiro] and on March 5, 1998, a Motion for Default Judgment was filed.

. . . .

## CONCLUSIONS OF LAW

1. The Settlement Agreement imposes no affirmative duty on [Guerreiro] to clear title to the [Sharpe] interest. There is no evidence that [Guerreiro] failed to "cooperate" with [Moran] as required by the Settlement Agreement.

2. Any ambiguity and conflicts arising among Paragraphs 1, 5 and 8 of the Settlement Agreement are construed against [Moran] as the preparer of the Settlement Agreement. There were ambiguities and conflicts in the terms of the Settlement Agreement between requiring [Guerreiro] to give a warranty deed to [Moran] and the uncertainty of the [Sharpe] interest evidenced by Paragraph 8.

3. In spite of the problem with the [Sharpe] interest, it is apparent that [Moran] is nevertheless willing to purchase the subject property upon terms which are considerably more advantageous to him than the terms of the Settlement Agreement, including but not limited to owner financing, 10 year term and 4% per annum interest rate.

4. Moreover, the new terms contained in [Moran's attorney's] letter dated September 2, 1997 reveals [sic] an attempt to commit fraud and theft upon [Guerreiro] by proposing to pay only $2,162.60 in interest over the 10-year term of the loan.

5. In addition, the filing of a new complaint in Civil No. 97–5086 was vexatious, harassing, unethical and an abuse of the judicial process since the same issues were being addressed by this court when it was filed on December 15, 1997. The subsequent request for Entry of Default filed on March 3, 1998 and the Motion for Default Judgment filed on March 5, 1998 were precipitantly filed in furtherance of the vexatious complaint and to out race this court's consideration of the issues.

6. [Moran] acted in bad faith in not closing the sale in accordance with the Settlement Agreement by failing to make an earnest effort to obtain financing, failing to prepare the necessary mortgage and conveyance documents and failing to make any effort to secure the [Sharpe] interest.

7. An overview of [Moran's] actions reveals a scheme and pattern of conduct designed to take the subject property from [Guerreiro] on terms which are unreasonably favorable to him and, in the instance of the September 2, 1997 new terms, through fraud and thievery.

8. It would be inequitable for [Moran] to benefit from his blatant abuse of the judicial process by unfairly, unconscionably and fraudulently taking the property from [Guerreiro] and to judicially pursue an unfair result.

9. As such, [Moran] should suffer the ultimate sanctions of dismissal of his complaint, with prejudice, and setting aside of the Settlement Agreement. The court imposes this ultimate sanction based on the court's inherent equity and supervisory powers as well as its inherent power to control the litigation process. By this ruling, the integrity of the judicial process and the promotion of fairness are maintained.

10. Moreover, [Moran] must release the Lis Pendens from the subject property.

On June 30, 1998, while Moran's attorney was examining the case file in preparation for an appeal, he discovered in the back of the case file folders several letters that Guerreiro had written and mailed directly to Judge Nakatani.[14] There were a total of eleven letters—eight dated from March 31, 1997 to January 26, 1998 and three undated. Although some of the letters merely informed Judge Nakatani of Guerreiro's schedule (that he was leaving on a trip or had returned to Hawai'i), several of these letters discussed issues related to the present case.

A letter dated September 8, 1997, for example, informs Judge Nakatani, partly as follows:

On April 30, 1997, as per Settlement Agreement "Exhibit A", I appeared at [Moran's attorney's] office and signed papers, "Exhibit A."

That was all that happened. No exchange of money, no nothing.

On Sept. 4, 1997 (last week), I received a letter from [Moran's attorney] "Exhibit B", threatening another lawsuit and offering another proposal. I refuse to make any-

---

14. The record on appeal indicates that Guerreiro also wrote a letter directly to Judge Kevin Chang which is fastened to the back cover of one of the record folders in this case. Additionally, there is, fastened to the back cover of one of the case folders, a handwritten note from Guerreiro that was attached to his copy of the "Order of Dismissal" of Moran's prior appeal in this case, entered by the Hawai'i Supreme Court. The copy of the Order of Dismissal, with Guerreiro's handwritten note stapled to it, was stamped "Received October 13, 1998 Civil Motions Division." We gather from a review of the record in this case that it is a circuit court administrative practice that when ex parte communications are re-ceived in a judge's chambers, the communications are routinely filed in the back portion of the case folders. Indeed, many of the ex parte communications received in this case were stamped with the following notation: "PLEASE PLACE IN BACK OF FILE[.]" We strongly recommend that this practice be changed and that all ex parte communications be returned, unopened, to the sending party. In the event that the ex parte communications are inadvertently opened by a judge or a judge's staff member, a copy of the communications should immediately be sent to all parties to the litigation who were not served with a copy by the sender.

more proposals, unless it's one to rid Mr. Moran as the buyer.

For over two weeks, [Kaehu], from [Hawaii Escrow] has been trying to contact Mr. Moran, to no avail.

She has all the documents ready and need only Moran to come up with the money, and we close the deal.

She also has the document securing the [Sharpe] interest. This document was the latest of many reasons for stalling and reducing the price they first offered at $495,000.00.

[Moran's attorney] knows very well that [Manuel's Estate] is without funds, so I believe he is trying to get the property, free. This, I send to you, as a source of information.

By a letter dated January 24, 1998, Guerreiro noted that he had received a letter from Moran's attorney on January 9, 1998, instructing Guerreiro to sign and return a stipulation to dismiss Civil No. 94–0044–01 "so that Judge Nakatani can close out the case." Guerreiro stated that he had complied, only to be served on January 24, 1998 with a new summons in Civil No. 97–5086–12. Guerreiro expressed that he was "devistated[,]" [sic] had "signed all papers sent to [him,]" had "agreed to the settlement agreement[,]" and believed Moran was "trying to dismiss Case No. 94–0044–01 just to issue Case [No.] 97–5086–12, since the previous case had a countersuit on it" and Moran knew Guerreiro had "no funds to counter[.]"

Another letter, received on March 16, 1998, stated, in pertinent part:

When I informed [Moran's attorney] that the [Sharpe] heirs *refused* to sell the property, it was the wrong term. It is not theirs to sell, therefore they will not want to bother with it.

(Emphasis in original.)

On June 29, 1998, Moran filed a notice of appeal. On September 10, 1998, the supreme court dismissed the appeal for lack of

jurisdiction, on grounds that the June 9, 1998 dismissal order had "not been reduced to a separate judgment dismissing the complaint and the counterclaim[.]" On remand, Moran filed a motion for partial summary judgment against Defendants on all claims made in Defendants' counterclaim, which the circuit court [15] granted on March 18, 1999.

Thereafter, on June 7, 1999, Moran filed a motion to set aside the June 9, 1998 order dismissing the complaint and setting aside the settlement agreement. In the motion, Moran argued that he was entitled to a new hearing based on the newly discovered evidence, consisting of "the letters from [Guerreiro] to [Judge Nakatani] that were not disclosed to [Moran] or his counsel." By an order dated July 27, 1999, the circuit court denied Moran's motion without conducting a hearing.[16]

Following the entry of a Judgment on September 27, 1999,[17] Moran filed this appeal.

## ISSUES ON APPEAL

Moran argues on appeal that: (1) the circuit erred in denying his demand for a jury trial on the order to show cause; (2) Judge Nakatani should have recused herself from presiding over the various order to show cause hearings; (3) the circuit court erred in entering its May 26, 1998 oral ruling and its subsequent June 9, 1998 "Order to Dismiss Complaint with Prejudice and Setting Aside Settlement Agreement"; and (4) the circuit court erred in entering the July 27, 1999 "Order Denying [Moran's] Motion to Set Aside Order to Dismiss Complaint with Prejudice and Setting Aside Settlement Agreement Filed on 6/6/98[.]"

## DISCUSSION

### A. *Moran's Right to a Jury Trial on the Order to Show Cause*

Relying on *Miller v. Manuel*, 9 Haw.App. 56, 64, 828 P.2d 286, 292 (1991), Moran con-

---

**15.** The Honorable Kevin S.C. Chang granted the motion for partial summary judgment.

**16.** Judge Sabrina McKenna (Judge McKenna) entered the July 27, 1999 "Order Denying Plaintiff's Motion to Set Aside Order to Dismiss Com-

plaint with Prejudice and Setting Aside Settlement Agreement Filed on 6/9/98[.]"

**17.** Judge McKenna entered the Judgment filed on September 27, 1999.

tends that he was entitled to a jury trial when the circuit court conducted several order to show cause hearings to review the April 30, 1997 settlement agreement.

In *Miller*, this court stated that

[w]here the evidence in the record shows that all the essential elements of a contract are present, a compromise agreement among the parties in litigation may be approved by the court and cannot be set aside except on grounds that would justify rescission. Generally, in the absence of bad faith or fraud, when parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it.

However, since very important rights are at stake in most cases, appellate courts must strive to ensure that the purported compromise agreement sought to be enforced is truly an agreement of the parties.

A motion to enforce a settlement contract is neither ordinary nor routine. It is the modern counterpart of the olden practice involving supplemental pleadings and formal trial or hearing of the issue as thus developed. Its relative simplicity is a concession to the policy favoring settlements, but only to the extent that full and fair opportunities to prove one's points are substantially preserved.

*Id.* at 63, 828 P.2d at 291 (citations, internal brackets, and quotation marks omitted; emphasis added). After reviewing the case law from other jurisdictions regarding the procedure to be followed when deciding a dispute over the validity or enforceability of a compromise settlement, this court then held:

[W]e will review the [Order Granting Motion to Enforce Settlement] as if it were a summary judgment. Thus, the question is whether the evidence presented to the trial court indicated that there was no genuine issue of material fact and that as a matter of law the parties had entered into a valid compromise agreement. *If not, the lower court should have either set the case for trial or at least held an evidentiary hearing on whether there was a compromise agreement among the parties.*

*Id.* at 64–65, 828 P.2d at 292 (citation and footnotes omitted, emphasis added). Based on the language in *Miller* underscored above, Moran contends that since he timely asserted his right to a jury trial below, he was entitled to a jury trial for the order to show cause proceeding. We disagree.

 We specifically held in *Miller* that summary judgment standards applied to a hearing on a motion to enforce a settlement agreement. Therefore, a motion to enforce a settlement agreement may not be decided summarily if there is any question of fact as to whether a mutual, valid, and enforceable settlement agreement exists between the parties. If there is a question of fact as to the existence of a mutual, valid, and enforceable settlement agreement, an evidentiary hearing must be held. If, after the evidentiary hearing is held, it is determined that a mutual, valid, and enforceable settlement agreement does not exist, the parties are essentially back to square one and trial on the issues presented by the underlying complaint must be set and set before a jury, if one of the parties has asserted the right to a jury trial. If, on the other hand, the trial court determines that a mutual, valid, and enforceable settlement agreement does exist between the parties, then any dispute as to whether the settlement agreement was breached is a question of fact, and where the right to a jury trial has been asserted, the question of fact must be decided by a jury. *See Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 460 (5th Cir.1995) (holding that "[o]nce a contract has been found, and its essential terms have been identified and determined to be enforceable, the issue of breach is properly addressed. This is [a] question of fact [and] the jury is in the best position to evaluate the evidence and to assess the credibility of witnesses.").

 In the case at bar, the circuit court, after conducting an evidentiary hearing, determined that Moran and Guerreiro had entered into a settlement agreement. The circuit court did not expressly determine whether the settlement agreement between Moran and Guerreiro had been mutually entered into and whether the agreement was valid and enforceable. However, based on

our review of the record, we conclude as a matter of law that the settlement agreement between them was not valid and enforceable.

■ It is undisputed that at the time the settlement agreement was entered into, Sharpe was dead and Guerreiro had no authority to convey Sharpe's interest in Parcel 3.[18] It is a well-settled principle that

> [n]o one ... can convey a better or greater title than he has; that is, no deed can operate so as to convey an interest which the grantor does not have in the land described in the deed, or so as to convey a greater estate or interest than the grantor has, even though by its terms it may purport to do so and even though it may, at least if it is a warranty deed, operate by way of estoppel to pass to the grantee any title or interest thereafter acquired by the grantor.

23 Am.Jur.2d *Deeds* § 336, at 297 (1983) (footnotes omitted). If, as Moran contends, the settlement agreement imposed a duty on Guerreiro to convey title to all of Parcel 3 (including Sharpe's interest) by warranty deed, then the settlement agreement was, as a matter of law, void, unenforceable, and properly set aside.

### B. *The Duty to Recuse Issue*

During the proceedings below, Moran's attorney requested that Judge Nakatani recuse herself because she was "privy to certain privileged and confidential material which [she] indicated [she] would keep privileged and confidential during the settlement negotiations." Judge Nakatani denied the request.

■ Moran now argues that Judge Nakatani, pursuant to Hawaii Revised Statutes § 601–7(b) (1993),[19] should have recused herself from presiding over the various order to show cause hearings because she was privy to confidential information as a result of settlement negotiations and because she received *ex parte* communications from Guerreiro that discussed the merits of the order to show cause hearing. In light of *Associates Fin. Servs. v. Mijo*, 87 Hawai'i 19, 950 P.2d 1219 (1998), in which the Hawai'i Supreme Court upheld the propriety of a trial judge encouraging settlement of a case on the eve of trial, we disagree with Moran that information Judge Nakatani was privy to during settlement negotiations disqualified her from reviewing the April 30, 1997 settlement agreement.

■ The *ex parte* communications issue is more problematic. HRCP Rule 5 requires, in relevant part, as follows:

> **(a) Service: When Required.** Every ... pleading subsequent to the original complaint unless the court otherwise orders because of numerous defendants, ... and every written ... brief or memorandum of law, ... and similar paper shall be served upon each of the parties[.]
>
> ....
>
> **(d) Filing.** Except as provided in subdivision (f) of this rule, all papers after the complaint required to be served upon a party, together with a certificate of service, shall be filed with the court either before service or within a reasonable time after service. All documents filed with the court shall be previously or contemporaneously served on all parties to the action, except as permitted in subdivision (a) above.
>
> **(e) Filing With the Court Defined.** The filing of pleadings and other papers with the court as required by these rules shall be made by filing them with the clerk of the court, except that the judge may permit the papers to be filed with him or

---

18. The record indicates, moreover, that when Guerreiro signed the settlement agreement, he did so only in his individual capacity, as Trustee for Manuel's Estate, and as Special Administrator for Nana's and Nuha's Estates.

19. Hawaii Revised Statutes § 601–7(b) provides, in relevant part:

> Whenever a party to any suit, action, or proceeding, civil or criminal, makes and files an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against the party or in favor of any opposite party to the suit, the judge shall be disqualified from proceeding therein. Every such affidavit shall state the facts and the reasons for the belief that bias or prejudice exists and shall be filed before the trial or hearing of the action or proceeding, or good cause shall be shown for the failure to file it within such time.

her, in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk.

Guerreiro, acting *pro se,* clearly violated the foregoing rule many times when he addressed and mailed correspondence directly to Judge Nakatani, without serving copies of such correspondence on Moran's counsel.

Canon 3(B)(7) of the Hawai'i Code of Judicial Conduct, which is identical to Canon 3(B)(7) of the American Bar Association Model Code of Judicial Conduct (2000 ed.), states, with respect to *ex parte* communications, in relevant part, as follows:

> (7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. **A judge shall not initiate, permit, or consider *ex parte* communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding** except that:

> (a) Where circumstances require, *ex parte* communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:

> (i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the *ex parte* communication, and

> (ii) the judge makes provision promptly to notify all other parties of the substance of the *ex parte* communication and allows an opportunity to respond.

(Bolded emphasis added.) The reason that *ex parte* communications are barred is

> to insure that "every person who is legally interested in a proceeding is given the full right to be heard according to law."

> *Ex parte* communications deprive the absent party of the right to respond and be heard. They suggest bias or partiality on the part of the judge. *Ex parte* conversations or correspondence can be misleading; the information given to the judge "may be incomplete or inaccurate, the problem can be incorrectly stated." At the very least,

participation in *ex parte* communications will expose the judge to one-sided argumentation, which carries the attendant risk of an erroneous ruling on the law or facts. At worst, *ex parte* communication is an invitation to improper influence if not outright corruption.

J. Shaman, S. Lubet & J. Alfini, *Judicial Conduct and Ethics* § 5.01, at 159–60 (3d ed.2000) (footnotes and brackets omitted).

The Commentary to Canon 3(B)(7) of the Hawai'i Code of Judicial Conduct provides some helpful guidance regarding a judge's duties when an *ex parte* communication is received by the judge:

> *Certain ex parte communication is approved by Section 3B(7) to facilitate scheduling and other administrative purposes and to accommodate emergencies. In general, however, a judge must discourage ex parte communication and allow it only if all the criteria stated in Section 3B(7) are clearly met. A judge must disclose to all parties all ex parte communications described in Sections 3B(7)(a) and 3B(7)(b) regarding a proceeding pending or impending before the judge.*

> . . . .

> *A judge must make reasonable efforts, including the provision of appropriate supervision, to ensure that Section 3B(7) is not violated through law clerks or other personnel on the judge's staff.*

In *A.H. v. P.B.*, 2 P.3d 627 (Alaska 2000), the appellant father argued impliedly on appeal that the superior court exhibited partiality to the appellee mother by accepting *ex parte* communications from her and forwarding these communications to him, thereby functioning as the appellee mother's "personal secretary[.]" *Id.* at 628. The Alaska Supreme Court held:

> The record does not establish that the court acted inappropriately in this regard. Both parties, one who appeared pro se at all times, and the other who appeared pro se after her attorney withdrew in 1997, besieged the superior court with communications expressly, and sometimes impliedly, seeking relief of various sorts. Some of these communications were ex parte, or

were not accompanied by proof of service. The Alaska Code of Judicial Conduct prohibits a judge from initiating, permitting, or considering ex parte communications in pending or impending matters. Dealing with pro se litigants who are unable or unwilling to follow service requirements and procedural formalities can be problematic. Even pro se litigants should be instructed to avoid ex parte communications and to submit certificates of service. Ultimately, ex parte communications should not be accepted for filing unless service has been made by the filing party, or unless the court makes service itself. Here the superior court appears to have attempted to follow this practice consistently. Any possible lapses were few, and do not demonstrate any bias against [appellant father].

5. Equally problematic is the ambiguity of informal requests for relief, such as the February 15, 1999, letter [appellee mother] sent to the superior court in this case. [Appellant father] treated this letter as a request for relief, and filed an opposition. The best practice is for a trial court, if it intends to give consideration to such a request, to indicate that it is treating the request as a motion for relief. Other parties may then respond as necessary without wondering whether the court has simply accepted the communication for filing and intends not to act on it absent further notice.

*Id.* at 628–29 (footnote omitted).

In this case, there is no indication in the record that the *ex parte* communications received from Guerreiro that Moran complains about on appeal[20] were ever returned to Guerreiro, unopened, with instructions that Guerreiro observe HRCP Rule 5. Additionally, it does not appear that Guerreiro was in any way discouraged from submitting such *ex parte* communications or informed that his correspondence would not be filed unless he complied with applicable procedural rules. With respect to the correspondence from Guerreiro that Moran's attorney discovered while preparing for a prior appeal, it does not appear that court staff ever provided Moran's attorney with a copy of said correspondence.

■ As noted previously, we are unable to discern from the record whether Judge Nakatani personally read Guerreiro's *ex parte* communications or whether such communications influenced her decision to dismiss Moran's complaint with prejudice. However, since Moran was unaware of the communications until after the judgment had been entered in this case, and since Moran's motion to set aside the order dismissing Moran's complaint due to the newly discovered *ex parte* communications was denied by the circuit court without a hearing, Moran was clearly prejudiced by the *ex parte* communications.

To remedy the due process concerns raised by the handling of the *ex parte* communications, we vacate that part of the June 9, 1998 order that dismissed Moran's complaint with prejudice and remand for further proceedings. *See Mauna Kea Power Co. v. Board of Land & Natural Resources,* 76 Hawai'i 259, 263, 874 P.2d 1084, 1088 (1994) (holding that a reopened hearing to allow rebuttal of the *ex parte* communications cured any due process concerns that receipt of the communications presented).

In light of our disposition of this appeal, we find it unnecessary to address Moran's argument that the circuit court abused its discretion when it applied its "inherent equity and supervisory powers as well as its inherent power to control the litigation process" and dismissed Moran's complaint with prejudice.

## C. *The Sharpe Deed*

Because of our vacatur of the order dismissing Moran's complaint with prejudice, we address, for the circuit court's guidance on remand, a legal issue that generated considerable confusion during the proceedings below—the validity of the May 7, 1992 deed which Sharpe signed, conveying her 1/18th interest in Parcel 3 to Moran. Kaehu, the escrow agent, was of the opinion that because

20. The record does contain an *ex parte* communication that Judge Nakatani received from Guerreiro and which Judge Nakatani forwarded a copy of to Moran's attorney.

Sharpe had signed the deed before she died, the deed was effective to convey Sharpe's interest in the parcel. Moran's attorney, on the other hand, was of the opinion that once Sharpe died, her 1/18th interest in Parcel 3 devolved to Sharpe's estate, rendering it necessary to probate or administer her estate or bring a quiet title action in order to allow her 1/18th interest to be conveyed.

■ It is well-settled law that to be operative as a transfer of realty, a deed must be delivered. 23 Am.Jur.2d *Deeds* § ·120, at 155. "The intention of the parties is an essential and controlling element of delivery of a deed." *Id.* § 123, at 158.

■ Where a grantor delivers a deed "to a third person with instructions to pass it on to the grantee, and without any reservation by the grantor of a right to recall it, [the delivery] is sufficient in law and effects a complete transfer of the title to the property." *Id.* § 139, at 169. In a commercial escrow transaction, where a deed is delivered to a third person to be delivered to the grantee upon the happening of an event or the performance of a condition, e.g., the payment of the purchase price, the delivery is conditional. C. Smith & R. Boyer, *Survey of the Law of Property* 280 (2d ed.1971). In such instances,

> the title to, the property passes to the grantee upon the performance of the condition or upon the happening of the event, that is, from the so-called "second delivery". In case of death of the grantor, ... title passes from the date of the "first delivery", that is, when the grantor hands the deed to the escrow depositary.

*Id.* at 281.

In this case, although the deed signed by Sharpe is included in the record on appeal, the conditions upon which the deed were based, if any, were not in the record on appeal. We are unable to determine, therefore, whether Sharpe signed the deed conditioned upon payment by Moran of a particular price for the subject property. If Moran were able to satisfy the conditions of the deed signed by Sharpe before her death, the deed would be effective to transfer Sharpe's interest in Parcel 3 to Moran. On the other hand, if it appears that after Sharpe signed the deed on May 7, 1992, Moran was unable to fulfill the conditions of the deed and, thereafter, Sharpe died, Sharpe's signing of the deed would be ineffective to pass Sharpe's interest in Parcel 3 to Moran. More facts are, thus, required to determine the validity of Sharpe's deed.

## CONCLUSION

In light of the foregoing discussion, we vacate: (1) that part of the circuit court's June 9, 1998 order that dismissed Moran's complaint with prejudice, as well as the following conclusions of law contained in the June 9, 1998 dismissal order: Conclusions of Law Nos. 4, 5, 6, 8, 9, and 10; (2) the order granting Moran's motion for partial summary judgment as to Defendants' counterclaim, entered by the circuit court on March 18, 1999; (3) that part of the circuit court's July 27, 1999 order that denied Moran's motion to set aside that part of the June 9, 1998 order that dismissed Moran's complaint; and (4) the Judgment filed on September 27, 1999. We remand this case for further proceedings consistent with this opinion.